UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL ACTION NO. 5:23-CR-00109-DCR-EBA

UNITED STATES OF AMERICA                                    PLAINTIFF

V.                      **UNITED STATES' TRIAL BRIEF**

TANNER M. ABBOTT                                            DEFENDANT

The United States of America, by and through the undersigned attorneys, respectfully submits this trial brief in the above-captioned case. This trial brief includes the names and contact information of trial counsel, an estimated length of trial, the case's procedural history, a summary of the facts the United States intends to prove at trial, and a brief discussion of potential evidentiary issues that may arise at trial.

Although the Court is well-aware of the Rules of Evidence, the United States hopes that the specific applications and precedents highlighted herein will help to streamline arguments regarding objections that may arise at trial.

I.     **Trial Counsel**

The government is represented by Assistant United States Attorney Zachary Dembo of the United States Attorney's Office for the Eastern District of Kentucky and Trial Attorney Alec Ward

of the Department of Justice's Civil Rights Division, Criminal Section. Their contact information is as follows:

>Zach Dembo
>Assistant United States Attorney
>260 W. Vine Street, Suite 300
>Lexington, Kentucky 40507-1612
>(859) 685-4908
>Zachary.dembo@usdoj.gov
>
>Alec Ward
>U.S. Department of Justice
>Civil Rights Division, Criminal Section
>150 M Street, NE
>Washington, D.C. 20002
>Telephone: 2(202) 532-3991
>Email: alec.ward@usdoj.gov

## II.  Procedural History

On October 5, 2023, a federal grand jury sitting in Lexington, Kentucky returned an indictment charging Defendant Tanner Abbott, a former Boyle County Sheriff's Deputy with four felony counts of Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242; one misdemeanor count of Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242; one felony count of Conspiracy, in violation of 18 U.S.C. § 371, and one count of Falsification of Records, in violation of 18 U.S.C. § 1519. (ECF No. 1). On December 7, 2023, the same grand jury returned a Superseding Indictment alleging the same seven offenses but amending information about the location of the offenses charged in Counts 1, 4, 5, and 6. (ECF No. 28)

The Defendant was arraigned on the Superseding Indictment on December 13, 2024, and entered a plea of not guilty to all counts. Pursuant to this Court's December 8, 2023, order, this case is set for a jury trial to begin on February 26, 2024.

## III.  Length of Trial

The United States estimates that jury selection will take half a day, that the prosecution's case-in-chief will take four and one-half days, and that the jury charge will take ninety minutes to deliver. At a prior hearing in this case, defense counsel represented that they anticipate the defense's case-in-chief will take two days to present.

IV. **Government's Theory of the Case**

At all times relevant to the charged offenses, the defendant was a Deputy with the Boyle County Sheriff's Office. This trial concerns four occasions on which the defendant, while acting under color of law, used gratuitous, unnecessary, and constitutionally unreasonable force against persons in his custody. In each instance, the defendant responded to disrespectful but nonthreatening actions by suspects -- verbal protest, minor noncompliance, or earlier flight – by striking the suspects in the face with significant force. In three instances, the defendant delivered "sucker punches" with his own fist; in one instance, he threw a physically-disabled suspect face-first into the wall of a hotel room he had just unlawfully searched without a warrant.

At trial, the government expects to prove the following facts with respect to each count of the Superseding Indictment:

a. **Arrest of J.C. (Count 1)**

On or about April 28, 2021, the defendant, assisted by several other police officers, arrested victim J.C. after J.C. fled for several miles from the defendant's attempt to conduct a traffic stop of the car J.C. was driving. The chase ended in a rear-end collision between J.C.'s car and a Garrard County police vehicle, which ended J.C.'s flight, but injured nobody.

J.C. was arrested, removed from his car, and handcuffed without the defendant or any other officer needing to use force. An assisting officer, who had joined the pursuit as it passed through

his jurisdiction, was holding J.C. by his handcuffed wrists near the rear of J.C.'s car when the defendant suddenly approached and punched J.C. in the face. At the time, J.C. was standing motionless, making no attempt to escape or resist, and doing nothing that threatened any person's safety. In his official report of J.C.'s arrest, the defendant made no mention of having used force against J.C.

As a result of being punched, J.C. sustained bodily injury, to wit: redness, swelling, bruising, and physical pain.

If J.C. testifies, the government also intends to elicit testimony from him regarding another occasion on which the defendant used force against him after he fled from a traffic stop, while he was not resisting arrest.

### b. Arrest of W.W. (Count 2 and 3)

On or about February 2, 2021, the defendant arranged for B.H., a fellow officer, to stop a car occupied by victim W.W., whom the defendant suspected of drug trafficking. The defendant went to the scene of the stop and, after running his police dog around the outside of the car, ordered W.W. and the driver out so that he could perform a search. W.W. was polite and cooperative as the defendant conducted a thorough search of his jacket, sweatshirt, and hip pockets.

Upon frisking the front of W.W.'s pants, the defendant felt a meth pipe that W.W. had concealed in his groin area. Upon feeling the pipe, the defendant handcuffed W.W.'s left wrist and pushed W.W. against the car. W.W. will testify that, instead of retrieving the pipe, the defendant began to squeeze W.W.'s testicles, prompting W.W. to protest. The defendant, still holding W.W.'s cuffed left wrist, took hold of W.W.'s right wrist and pushed W.W. against the car a second

time. At this, W.W. began to protest more vociferously, complaining that he was being "roughhoused." The defendant, although holding both of W.W.'s wrists, repeatedly ordered W.W. to put his hands behind his back. A moment later, despite his position of tactical advantage, his greatly superior physical size and strength, and the immediate presence of another officer to assist with handcuffing W.W. if needed, the defendant released W.W.'s right wrist and punched him in the face with a closed fist. The punch cased W.W. pain and swelling.

After being punched, W.W. began to physically resist the defendant, and the two fell to the ground and began to wrestle. B.H. intervened and was able to force W.W. into handcuffs without striking him.

Later that night, the defendant directed B.H., who had formally arrested W.W., to falsely state in his arrest report that W.W. had made an "aggressive advancement" toward the defendant in the moments before the defendant punched him. Despite knowing that no such thing had occurred, B.H. agreed, and included the false statement in his report.

The defendant filmed a portion of W.W.'s arrest on his cell phone. During most of the events relevant to Count 2, the camera's lens was either obstructed or pointing away from W.W. and the defendant, and the footage therefore captured only audio. The defendant did not submit the video into evidence or disclose its existence in any official police documentation. The government expects to introduce and publish the video during its case-in-chief.

c. **Arrest of B.T. (Counts 4, 5, and 6)**

On or about March 30, 2021, the defendant went to a hotel in Harrodsburg, Kentucky, where victim B.T., whom the defendant suspected of drug trafficking, was living. The defendant

5

went to B.T.'s door and requested B.T.'s consent to search the room, telling B.T. "we can do this the easy way or the hard way." B.T. refused consent, telling the defendant he wanted to "do it the hard way," and telling the defendant to come back with a warrant if he wanted to search the room. After being refused consent to search the room, the defendant entered the room anyway, using a key he had obtained from the hotel manager by falsely representing that he was executing a search warrant. Once inside, the defendant went through drawers and containers until he found what be believed to be narcotics (the seized material later tested negative for controlled substances). While the defendant was searching his room, B.T. continued to protest that he did not consent and that the search was illegal. When the defendant placed B.T. under arrest, B.T. instructed his girlfriend, who was also present, to contact a local attorney and file a harassment complaint against the defendant. Hearing this, the defendant forcefully shoved B.T. by the head into the hotel room wall. B.T., who requires a leg brace to walk due to a physical disability, collided with the wall face-first, and suffered injury.

The defendant later wrote and submitted a police report in which he falsely stated that B.T. had given him consent to search the hotel room. In the report, he made no mention of having used force to effect B.T.'s arrest.

### d. Arrest of D.N. and C.B. (Count 7)

On or about January 20, 2021, the defendant stopped a car being driven by victim D.N. and also occupied by D.N.'s adoptive brother, C.B. While pulling over, D.N. attempted to conceal a nicotine e-cigarette (which, because he was under the age of 21, was illegal for him to possess) under his leg. However, D.N. dropped the cigarette and, in the course of trying to retrieve it from the car's footwell, inadvertently drove off the roadway and into a grassy depression between the

roadway and a nearby parking lot. The car was not damaged, and neither occupant was injured. The defendant approached the car and accused D.N. of being drunk. D.N. protested that he was not drunk, and the defendant began to mimic D.N. in an exaggeratedly high and nasal tone of voice. Upset and concerned by the defendant's behavior, D.N. told the defendant that he wanted to speak to a police supervisor. The defendant first told D.N. (falsely) that he was a supervisor, then told D.N. that his supervisor was asleep. D.N. again said that he was not drunk and asked to speak with a supervisor. Without warning, the defendant suddenly pulled open the car door and punched D.N. in the face, while simultaneously ordering him to get out of the car. Without giving D.N. a chance to comply, the defendant then pulled D.N. out of the car, threw him to the ground, and struck him several more times. In fear for his brother's safety, C.B. got out and walked to the front of the car, yelling at the defendant to stop, but not physically intervening. After handcuffing D.N., the defendant rushed toward C.B. and struck him in the face with an elbow, knocking him to the ground and breaking his glasses. The defendant then handcuffed C.B. Upon later search, C.B. was discovered to be in possession of an e-cigarette and e-cigarette cartridges containing THC.

Later that night, the defendant learned that his punch had caused two fractures to D.N.'s nasal bone and a fracture to his occipital bone. After learning this, the defendant sent text messages to multiple people bragging that he had "broke[n] [D.N's] face with one punch."

## V. Anticipated Evidentiary Issues

### e. Impeachment of Government Witnesses with Prior Convictions

Several anticipated government witnesses have significant criminal histories. The Federal Rules of Evidence place limitations on the use of a witness's criminal history to attack the witness's character for truthfulness. In short, Fed. R. Evid. 609 provides that a witness may be impeached

with convictions for felony offenses and misdemeanor "crimes of dishonesty." If the conviction was imposed or the witness was released from custody within 10 years of his testimony, the conviction must be admitted subject to the ordinary balancing test provided for by Fed. R. Evid. 403. See Fed. R. Evid 609 Adv. Comm. Note to 1990 Amendments ("[T]he amendment applies the general balancing test of Rule 403 to protect all litigants against unfair impeachment of witnesses."). If the witness's conviction or release date occurred more than 10 years before the date of testimony, the evidence is subject to "reverse 403" balancing – i.e., it may be admitted only if its probative value substantially outweighs its prejudicial effect..

When evidence a conviction is admissible under Rule 609, that evidence is limited to the "essential facts" of the conviction -- the date and place of the convictions, the number of counts, and the nature (i.e., the name) of the crime of conviction. *United States v. Villanueva*, 249 F. App'x 413, 418 (6th Cir. 2007) ("impeachment under Rule 609 is generally limited to the fact of conviction and should not include the details and circumstances surrounding the conviction." (citing *United States v. Turner*, 995 F.2d 1357, 1363–64 (6th Cir. 1993)). *See also Doe v. Sullivan Cnty., Tenn.*, 956 F.2d 545, 551 (6th Cir. 1992).

In this trial, therefore, if the government calls a witness with one or more admissible prior convictions under Fed. R. Evid. 609, the defense will be entitled to elicit the name, date, place, and name of the qualifying convictions. However, that entitlement does not extend to proving or inquiring into irrelevant and prejudicial details of the witness's underlying criminal conduct, and the government intends to request that the Court exercise its discretion to exclude further unhelpful and prejudicial details.

    **f. Other Uses of Victim Criminal History**

Evidence of prior arrests, indictments, and other instances of victims' or witnesses' law enforcement contact that did not result in 609-qualifying convictions is subject to the same rules that govern all evidence of other specific instances of conduct. Which is to say, such evidence may not be used to prove action in conformity with a propensity upon a particular occasion, Fed. R. Evid. 404(b), or to prove character traits of victims, Fed. R. Evid. 405.

As relevant here, these restrictions prohibit the defendant from introducing evidence that a charged victim resisted arrest or fled from police on another occasion – whether that conduct resulted in a conviction or not – in order to suggest that the person resisted arrest or fled from police during a charged incident. *See United States v. Hanshaw*, 2015 WL 5308058, at *2 (S.D. Ohio Sept. 11, 2015). ("Defendants are explicit that they seek to introduce evidence of L.K.'s acts [of resistance to arrest] on [an earlier occasion] in order to show propensity toward aggressive behavior aimed at police officers. But this is exactly the type of evidence that Rule 404(b) prohibits.")

Prior instances of resistance to arrest or flight that did not result in qualifying convictions also may not be inquired into on cross-examination for the purpose of probing credibility. Fed. R. Evid. 608(b). Evidence that the victim of a § 242 excessive force offense resisted arrest or fled from police on other occasions is not probative of the victim's truthfulness as a witness, as resisting arrest, though hardly the conduct of a model citizen, is not an act of dishonesty.

There is one narrow exception to this general rule: where an officer-defendant had personal knowledge of an arrestee's prior acts of resistance at the time of the charged use-of-force and testifies that he factored such knowledge into his decision to use force on the occasion in question. *See Avila v. Knight*, 475 F. Supp. 1054, 1055 (S.D.N.Y. 1979) (ruling, in excessive force case, that

9

evidence of the victim's criminal records and disciplinary history was not relevant "because at the time of the incident, [the defendant-officer] had no knowledge of [the victim's] alleged acts of prior assault or violence"). Even in that case, however, the defendant should not be permitted to introduce irrelevant or prejudicial details, and his testimony remains subject to Rules 402 and 403.

> g. **Specific Instances of Good Conduct**

Similarly, the defendant may not seek to prove his own good character by evidence of specific acts of good conduct. Any prior acts of bravery, heroism, public service, or self-sacrifice in the line of duty as a Sheriff's Deputy are not admissible to prove or suggest that because the defendant is not the kind of person to abuse his power, he did not do so on the specific occasions in question. Fed. R. Evid. 404. Furthermore, such evidence should be excluded under Rule 403, because it has no probative value and would serve mainly to suggest that the jury should overlook the defendant's use of excessive force because he was otherwise a good police officer, *see United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996) (Posner, J.) ("[T]he defendant has no right to invite the jury to act lawlessly."); *United States v. Melton*, 2008 WL 4829893, at *2 (S.D. Miss. Nov. 4, 2008) (excluding evidence of a defendant-officer's reputation for fighting crime on the ground that it was "aimed at inducing jury nullification").

> h. **Potential Nullification Evidence and Argument**

Trials in which law enforcement officers are accused of mistreating criminal suspects often inescapably pose a heightened risk that a jury may render a verdict based on sympathy or relative assessment of virtue and deservingness, rather than on an application of law to admissible evidence. *Barber v. City of Chicago*, 725 F.3d 702, 714 (7th Cir. 2013) (observing "that civil rights actions often pit unsympathetic plaintiffs— criminals, or members of the criminal class—against the guardians of the community's safety," and reasoning, therefore, that presenting a civil-rights

victim's "criminal history to the jury presents a substantial risk that the jury will render a defense verdict based not on the evidence but on emotions or other improper motive")

Defendant-officers in § 242 trials sometimes attempt to exploit this dynamic by introducing evidence calculated to encourage such verdicts. While the government has no indication that the defense intends to encourage jury nullification or to invite the jury to decide the case on improper grounds, there are certain objectionable lines of argument that regularly arise in trials of this kind. For the purpose of streamlining discussion of any possible trial objections, the government will address some of these common impermissible arguments below, and outline the rules that it may rely on in seeking to exclude any of them that may arise at trial.

<u>Argument that the defendant has already been punished enough</u>

Police officers who are federally indicted for deprivation of rights have often been dismissed from their departments or otherwise been administratively disciplined by the time their cases come to trial. In this case, the defendant was dismissed from the Boyle County Sheriff's Office shortly after the FBI notified the then-Sheriff that the defendant was under active investigation. The official reason for his termination was a finding of misconduct unrelated to any of the charged offenses, although official termination paperwork also notes the fact that he was, by then, under federal criminal investigation.

The parties intend to stipulate that the defendant's employment with the Boyle County Sheriff's Office was terminated on September 7, 2021. The government does not intend to delve into the unrelated misconduct that resulted in the defendant's termination, or to invite the jury to speculate on the reasons for the dismissal. But conversely, the defendant should not be permitted to argue or suggest in any manner that he should be acquitted on account of his dismissal. Any

11

argument that he has already suffered or been punished enough on account of his termination, or that the government continuing to investigate and prosecute him after his dismissal amounts to "overkill" or cruelty would amount to inviting the jury to nullify the law and acquit based on their assessment of appropriate consequences and punishment, rather than of guilt or innocence. Introducing such considerations into the jury room is improper. *Shannon v. United States*, 512 U.S. 573, 579 (1994) ("The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury.") Accordingly, litigants are not entitled to implore juries to consider the consequences of their verdict. *United States v. Anderson*, 563 F. Supp. 3d 691, 697 (E.D. Mich. 2021), *aff'd,* No. 22-1237, 2023 WL 3413905 (6th Cir. May 12, 2023) (describing that proposition as "well-settled"). *See also Wofford v. Woods*, 969 F.3d 685, 709 (6th Cir. 2020); *United States v. Krzyske*, 836 F.2d 1013, 1021 (6th Cir. 1988) (holding, more generally, that defendants are not entitled to argue that the jury should acquit based on considerations other than legal guilt).

Furthermore, because the defendant's termination from BCSO was in fact due to other misconduct unrelated to the events at issue in this trial, any suggestion that, because he was fired, he has already been punished (fairly or not) for the conduct at issue would be false and misleading.

Unrelated violence against police officers

Defendants in excessive force trials sometimes attempt to introduce evidence of other, unrelated incidents of violence against police officers, to emphasize the dangerousness of policing as an occupation and to underscore that use of force is frequently necessary for police officers to defend themselves or the public from grave harms.

Evidence of the general dangerousness of the law enforcement profession and of the legitimacy of other officers' use of force against other suspects has little probative value or relevance to a jury that will be charged with deciding whether a specific officer's use of force against specific suspects under the particular circumstances of a specific arrest was reasonable under the circumstances.

To the contrary, such evidence poses a great risk of confusing the jury, wasting time, and inducing a verdict based on impermissible and irrelevant considerations. Courts have excluded police defendants from presenting such evidence, *see United States v. Rushin*, 844 F.3d 933, 941-42 (affirming district court's order prohibiting defendant prison guards from introducing evidence of unrelated acts of violence at the facility where "the defendants' logic implied that due to the harsh conditions at [the prison], defendants were justified in beating handcuffed prisoners" and the "basis for admitting [the] evidence … appeared to be jury nullification.") If the defendant attempts to introduce it in this case, the government will ask this Court to do likewise.

<u>Suggestion that victims got what they deserved</u>

As discussed above, several of the victims in this case have criminal histories that will be subject to the provisions of Rule 609 if the victims testify.

Although the defendant may be entitled to prove certain aspects of testifying victims' criminal history for limited purposes, he should not be allowed to invite the jury to make impermissible use of that evidence.

Any argument suggesting that the victims were criminals who deserved to have unreasonable force used against them or who are undeserving of the law's protection would

likewise amount to an invitation to nullify. As discussed, trial courts hearing § 242 cases involving excessive force have discretion to prohibit such arguments, and this Court should do so. *See, e.g., Tolliver v. Gonzalez*, 2011 WL 5169428, at *2 (N.D. Ill. Oct. 31, 2011) ("What would not of course be appropriate for jury consideration would be any notion that a physical altercation between the Tollivers before the officers arrived would somehow justify [the officers'] imposition of excessive force on Tolliver (on some notion that he deserved what he got).").

### i. Evidence of Law Enforcement Policy and Training

To establish a violation of 18 U.S.C. § 242, the government must prove not only that the defendant violated one of the victim's constitutional rights, but also that he did so "willfully." 18 U.S.C. § 242. To establish that a defendant acted "willfully" in committing a deprivation of rights under color of law, the government must prove that the defendant "act[ed] with 'a specific intent to deprive a person of a federal right made definite by decision or other rule of law" or "in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite." *Screws v. United States*, 325 U.S. 91, 94 (1945).

Willfulness, like other forms of specific intent, typically must be proved by circumstantial evidence. Evidence that the defendant acted in a manner inconsistent with policies that he was aware of and supposed to follow supports an inference that he intended to abuse his authority, and therefore acted willfully. *United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) ("evidence of departmental policies can be relevant to show intent in § 242 cases."); *United States v. Michael Brown*, 934 F.3d 1278, 1296 (11th Cir. 2019) (holding that "[defendant]'s training in the use of force supports the jury's finding of willfulness," because "where an officer's actions so obviously violate his training on the use of force, a jury may infer that the violation was willful"). *United States v. Rodella*, 804 F.3d 1317, 1337-38 (10th Cir. 2015) (affirming District Court's instruction

that jury could consider evidence of policy and training violations in evaluating whether police defendant acted with willful mental state required to violate § 242). *See also United States v. Thao*, 76 F.4th 773, 778 (8th Cir. 2023) (considering policy and training evidence in assessing sufficiency of evidence as to willfulness element of police officer's § 242 conviction for failure to intervene in colleague's use of excessive force).

The same evidence, however, is not relevant to the issue of whether an officer's use-of-force violated the Fourth Amendment's "objective reasonableness" standard – a second and separate element of a § 242 charge for using excessive force. *United States v. Aldo Brown*, 871 F.3d 532, 536–37 (7th Cir. 2017) ("The excessive-force inquiry is governed by constitutional principles, not police-department regulations. *Scott v. Edinburg*, 346 F.3d 752, 760–61 (7th Cir. 2003). An officer's compliance with or deviation from departmental policy doesn't determine whether he used excessive force."); *Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir. 2006) ("Whether [the defendant's] conduct conformed with the internal [policies] concerning the use of force on an assailant was irrelevant to the jury's determination of whether his actions… were 'objectively reasonable' under the Fourth Amendment.")

Therefore, if either party introduces evidence of Boyle County Sheriff's Office policy or training, the Court should give a limiting instruction pursuant to Fed. R. Evid. 105 instructing the jury that they may consider the evidence only in deciding whether the defendant acted willfully, and not in deciding whether he violated the Fourth Amendment. Similar limiting instructions have generally been deemed sufficient to prevent officer-defendants from being unfairly prejudiced by the admission of policy and training evidence. *See Proano*, 912 F.3d at 440 (upholding admission of training evidence with limiting instruction); *Brown*, 934 F.3d at 1296 ("Although the jury may consider a department's policies as relevant evidence, district courts should follow the example

here of using limiting instructions to prevent the jury from conflating a violation of departmental policy with a violation of the Constitution."). The government's proposed jury instructions contain an instruction limiting the jury's consideration of policy and training evidence to the issue of willfulness. The government's proposed instruction is adapted from an instruction expressly approved by the Seventh Circuit in the *Proano* case and since adopted by the Seventh Circuit as a pattern instruction on the issue.

### j. Testimony Regarding the Ultimate Issue of Reasonableness

An unusual aspect of § 242 prosecutions is that the jury is called on to decide what would, in most other contexts, be a question of law for the Court – that is, whether a law enforcement officer's actions violated a suspect's constitutional rights.

Where a defendant-officer is charged with using excessive force in the course of making an arrest, the right in question is the Fourth Amendment right to be free from unreasonable seizures. *Torres v. Madrid*, 141 S. Ct. 989 (2021); *Graham v. Connor*, 490 U.S. 386, 396 (1989). A police officer's use of force in making an arrest constitutes an unreasonable seizure when the force used is "objectively unreasonable" in light of the totality of the circumstances of the specific case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 394. In evaluating reasonableness, those circumstances are to be viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396).

Therefore, in this trial, the jury will need to apply the *Graham* analysis to the facts in evidence and make a finding as to whether any force that it finds the defendant to have used in making an arrest was "objectively reasonable."

This comparatively unusual situation has implications for the permissible scope of lay and expert opinion testimony. The Federal Rules of Evidence permit lay and expert witnesses to testify in the form of an opinion only if such testimony is helpful to the jury. Fed. R. Evid. 701, 702. Opinion testimony that that merely expresses the witness's opinion on how the jury should rule is not helpful, and therefore inadmissible. Adv. Comm. Note to Fed. R. Evid. 704 (noting that, although Rule 704 is a permissive rule which abolishes the old common-law prohibition on "ultimate issue" opinion testimony, Rules 701 and 702 should still be understood to prohibit "opinions which would merely tell the jury what result to reach."). See also *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)

Because in an excessive force prosecution, the jury must find whether the defendant's use of force was "objectively unreasonable," a witness's opinion on that topic is unhelpful, because it merely tells the jury what result to reach. *United States v. Perkins*, 470 F.3d 150, 159 (4th Cir. 2006) (holding that no witness may testify to "the baseline legal conclusion of reasonableness"); *United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (holding expert testimony as to "the reasonableness of the officers' conduct in light of Fourth Amendment standards" inadmissible as a legal conclusion). These precedents prohibit any witness from giving an opinion on whether the Defendant's use of force was "reasonable," "lawful," or "appropriate."

Importantly, however, that rule does not prohibit lay or expert witnesses from giving opinion testimony that is helpful to the jury in reaching that ultimate conclusion. For example, lay

17

witnesses with personal knowledge of the incident—such as other officers who witnessed the defendant use force-- may testify about the conclusions and opinions they formed based on their observations, such as whether a suspect posed a danger to officer safety, whether a suspect seemed to be trying to harm officers, and whether they believed that the defendant had committed or was contemplating a violent crime. In contrast to opinions on the ultimate legal conclusion of reasonableness, these type of lay opinions, when offered by witnesses with firsthand knowledge, can help the jury to view relevant events through the eyes of a reasonable officer on the scene *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (listing factors relevant to objective reasonableness determination); *United States v. Keys*, 747 Fed. Appx. 198, 209 (5th Cir. 2018) (permitting witnesses to offer their opinion on "specific factual building blocks of the ultimate crime").

Respectfully submitted,

KRISTEN M. CLARKE
Assistant Attorney General
Civil Rights Division

Date: February 20, 2024

By: /s/ *Alec C. Ward*
Alec C. Ward
U.S. DEPARTMENT OF JUSTICE
CIVIL RIGHTS DIVISION
150 M Street NW
Washington, DC 20002
(202) 532-3991
Alec.ward@usdoj.gov

CARLTON S. SHIER IV
United States Attorney
Eastern District of Kentucky

By: /s/ *Zachary Dembo*
Zachary Dembo
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4908
Zachary.dembo@usdoj.gov

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that a copy of the foregoing was delivered on February 20, 2024, to the CM-ECF system of the U.S. District Court for the Eastern District of Kentucky for electronic delivery to all counsel of record.

                                                  */s/ Alec C. Ward*
                                                  Alec C. Ward
                                                  Trial Attorney, Civil Rights Division
                                                  United States Department of Justice