1

1    Case No. 23-cr-109

2    Case Name:  U.S. v. Abbott

3    Type of Hearing:  Trial Day 2

4

5        This realtime translation has not been edited, proofread,

6    or corrected.  It is a draft transcript and is not certified

7    to be true and correct.  It may contain computer-generated

8    mistranslations of stenotype code or electronic transmission

9    errors, resulting in inaccurate or nonsensical word

10   combinations or untranslated stenotype symbols which cannot be

11   deciphered by non-stenotypists.

12       The realtime translation may differ from a certified

13   transcript of the same proceedings in contact, page and line

14   numbers, punctuation, and formatting.

15       -Guide to Judiciary Policy, Section 320.50.50

16

17

18

19

20

21

22

23

24

25

1          BRAYDON HOPPER, GOVERNMENT'S WITNESS, SWORN

2          THE COURT:  Thank you.

3       Mr. Dembo, you may proceed.

4          MR. DEMBO:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6   BY MR. DEMBO:

7   Q.   Good afternoon.  Would you please state and spell your

8   name for the record?

9   A.   Braydon, B-r-a-y-d-o-n, Hopper, H-o-p-p-e-r.

10  Q.   How are you currently employed, Mr. Hopper?

11  A.   I'm a police officer with the Lancaster Police

12  Department.

13  Q.   How were you employed in the period of time between

14  January and April of 2021?

15  A.   Deputy sheriff with the Boyle County Sheriff's Office.

16  Q.   During that period of time in 2021, who did you work with

17  the most?

18  A.   Tanner Abbott.

19  Q.   Were you two close?

20  A.   Yes.

21  Q.   Were you two close outside of work as well?

22  A.   Yes.

23  Q.   Do you see Mr. Abbott here in court?

24  A.   I do.

25  Q.   Could you identify him based on an article of clothing

HOPPER - Direct                                                    3

1    he's wearing?

2    A.   Blond hair, he's wearing a gray jacket and pants.

3            MR. DEMBO:   Thank you.  If the Court --

4            THE COURT:   The record will reflect that the witness

5    has identified the defendant, Tanner Abbott.

6            MR. DEMBO:   Thank you.

7    BY MR. DEMBO:

8    Q.   Are you still close with the defendant?

9    A.   No.

10   Q.   Why not?

11   A.   We buried the hatch a long time ago; it was about 2021

12   when we stopped talking.  I quit talking to him because I

13   didn't like who he was.

14   Q.   We'll talk about some of that in a bit, but let's talk

15   about your background.

16           First, where are you from, Mr. Hopper?

17   A.   I was are born in Lexington, Kentucky, I was raised in

18   Paducah, Kentucky.

19   Q.   How is it you came back to the Bluegrass region?

20   A.   My mom lives in Lexington, I moved to Mt. Washington and

21   worked at a jail when I first turned 21.  Started in law

22   enforcement and then moved in Fayette County, where my mom

23   lived.  And I met a buddy that worked at Danville Police

24   Department.  And then I moved -- actually when I went to the

25   academy, I went to the academy at Lebanon Junction Police

1   Department, which is in Boyle County.  I'll backtrack, and

2   moved to Danville, got on Danville Police Department, worked

3   there for about a year and that's when I transferred over to

4   the Boyle County Sheriff's Office.

5   Q.   So you mentioned, I think your first police job was

6   working for Lebanon Junction; is that right?

7   A.   Correct.

8   Q.   When was that?  What year was that?

9   A.   2017.

10  Q.   And since 2017 have you been a law enforcement officer, I

11  should say police officer or deputy sheriff since that time?

12  A.   Yes, sir.

13  Q.   You also mentioned that through Lebanon Junction you

14  ended up going to the academy; is that right?

15  A.   Yes.

16  Q.   And that's done at the Department of Criminal Justice

17  Training in Richmond; right?

18  A.   Yes, sir.

19  Q.   Approximately how long was the academy you went to?

20  A.   Six-and-a-half months.

21  Q.   After you graduated from the academy at Danville Police

22  Department or Boyle County Sheriff's Office, did you receive

23  any additional training?

24  A.   Yes.

25  Q.   What kind of training did you receive at those two

1    agencies?

2    A.   One was a like a tactics course, other than tactics, we

3    took narcotics, basic narcotics, DEA put on, and this is all

4    through 40 hours through the state where you have to get

5    your -- keep your POP certification.

6         Actually I went to I would say two or three trainings

7    with Tanner that would have been narcotic related.

8    Q.   You mentioned you needed to have 40 hours to have your

9    POP certification.  What is a POP certification?

10   A.   It's your certification to the state what keeps you a

11   police officer.

12   Q.   So you're a required to have a minimum of 40 hours in

13   service?

14   A.   Yes, sir.

15   Q.   And when you were at Danville, did you fulfill that

16   requirement?

17   A.   I did.

18   Q.   When you were at Boyle County Sheriff's Office, was that

19   requirement also fulfilled?

20   A.   Yes, sir.

21   Q.   You mentioned that you participated in a few trainings

22   with the defendant, Mr. Abbott; is that right?

23   A.   Yes, sir.

24   Q.   Do you recall what those trainings were, specifically?

25   A.   One would have been basic narcotics -- investigations,

1    and the other would have been undercover operations.

2    Q.    Now, taking all this training together, starting at the

3    academy and all these other agencies you've worked at, what

4    generally, in layman's terms, did these trainings tell you

5    about the amount of force you were allowed to use as an

6    officer on a suspect?

7    A.    They go by, like, it's a tier system.  It's called use of

8    force continuum.  Basically how that goes is verbal, passive

9    aggression, it obviously goes all the way up to deadly force.

10   Q.    What did the training tell you about the level of force

11   you were allowed to use compared to the resistance the suspect

12   was displaying?

13   A.    I mean, if he's showing aggressive tendencies, I mean,

14   obviously we have to get his hands behind his back, but once

15   he's in handcuffs, I mean, basically it's over at that point.

16   Q.    And when you say it's over, what did your training tell

17   you about the level of force you can use on an individual who

18   is handcuffed?

19   A.    No force.

20   Q.    What did the training tell you about using force to

21   punish a suspect for something they had done earlier?

22   A.    I don't understand that question.

23   Q.    Under the training you received, were you ever trained

24   that you could use force to punish a suspect for something

25   they had done earlier?

1    A.    Absolutely not.

2    Q.    Were you ever trained that you could use force out of

3    anger on a suspect?

4    A.    No.

5    Q.    What did this training that we've talked about say about

6    the importance of being truthful and complete in reports that

7    you wrote?

8    A.    By putting in your report what happened.

9    Q.    Why, from your training, was it significant that you

10   needed to put in your report what happened?

11   A.    Because if you didn't put it in your report, it didn't

12   happen.

13   Q.    Was that a phrase that you heard in training, if it

14   wasn't in your report, it didn't happen?

15   A.    Correct.

16   Q.    The sort of reports you fill out as a law enforcement

17   officer, what are they typically used for?

18   A.    The reports?

19   Q.    Yes, sir.

20   A.    The arrest citation would be what you use to book a

21   subject into jail, a NIBRS is another form of something like

22   for felonies and stuff like that, but also it's like an extra

23   documentation to go with that.  But a citation is what would

24   be -- what you use to book somebody in jail, it would be your

25   initial report.

1   Q.   So that report could be used ultimately to charge someone

2   with a crime; right?

3   A.   Yes, sir.

4   Q.   Ultimately be shown as evidence in court; is that right?

5   A.   Yes, sir.

6   Q.   It could result in someone going to jail or prison;

7   right?

8   A.   Yes, sir.

9   Q.   Were all of these trainings we've discussed, to your

10  knowledge, still fully in effect during this period of time

11  between January and April 2021 when you were a deputy sheriff

12  at the Boyle County Sheriff's Office?

13  A.   Yes, sir.

14  Q.   Do you have any reason to think that Boyle County had any

15  different training or rules other than the basic ones we've

16  discussed compared to the other agencies?

17  A.   No.

18  Q.   Do you have any reason to think that the defendant didn't

19  know what the training was?

20  A.   No.

21  Q.   Did you have any reason to think that the defendant had

22  measurably different training from the same training you had

23  received?

24  A.   No.

25  Q.   You mentioned prior to going to Boyle County you'd served

1   at the Danville Police Department; is that right?

2   A.   Yes, sir.

3   Q.   To your knowledge, did the defendant also serve in the

4   Danville Police Department?

5   A.   He did.

6   Q.   Let's talk about some of these incidents that led up to

7   the time when you stopped talking with the defendant.  First,

8   do you recall interacting with someone named William Welch

9   during a traffic stop on February 2nd, 2021, in Danville?

10  A.   I do.

11  Q.   Where specifically in Danville did this interaction

12  happen?

13  A.   On Jane Trail.

14  Q.   What were the events that led up to that traffic stop?

15  A.   It started as a narcotics investigation.  It would have

16  been what we call a controlled buy, it also can be known as a

17  buy/bust.  Basically what it is is having a confidential

18  informant or confidential source, and what it was if we

19  coordinated with that person to a purchase illegal narcotics

20  from Mr. Welch, myself and Tanner were watching from a

21  distance, and when William Welch walked out of the car and

22  went and did a hand to hand interaction and walked back to the

23  car, eyes never laid off of him.

24       He got in the car, another black subject walked out of

25  Cattleman's and got in the car in the driver seat which

*HOPPER - Direct*                                                          10

1    William Welch had gotten in the passenger seat, and when they

2    took off, I initiated a traffic stop for minor traffic

3    violations.

4    Q.   We've heard the Cattleman's referred to a few times,

5    that's a restaurant in Danville; is that right?

6    A.   Yes, sir, a steakhouse.

7    Q.   A steakhouse.  And you initiated a traffic stop for minor

8    traffic violations you said; is that right?

9    A.   Yes, sir.

10   Q.   However, at that time, you were aware, based on your

11   observation, that Mr. Welch had just engaged in a drug deal;

12   is that right?

13   A.   Yes, sir.

14   Q.   Whose idea was it to orchestrate that drug deal?

15   A.   Tanner coordinated most of it.

16   Q.   So if he were to suggest at any point that he had no idea

17   why the stop occurred, that would not be accurate; is that

18   right?

19   A.   I'm sorry, what?

20   Q.   If he were to suggest that he had no idea why you would

21   have initiated a traffic stop on Mr. Welch, that would not be

22   accurate; correct?

23   A.   Huh-uh.

24   Q.   Is that a no?

25   A.   No.

1  Q.   Sorry, for the court reporter --

2  A.   I understand, I'm sorry.

3  Q.   -- we've got to say yes or no.

4       So after you pulled the vehicle over, what were your

5  interactions like with the occupants of the vehicle?

6  A.   I approached the driver's side of the vehicle, which

7  would have been where I identified later as Jordan White, it

8  would have been his vehicle, and Mr. Welch was in the

9  passenger seat.  That would have been when Tanner came on

10 scene, made contact with William on the passenger side of the

11 vehicle.

12 Q.   What happened after you made contact with Mr. White and

13 the defendant made contact with Mr. Welch?

14 A.   I just went through it like a normal traffic stop, and

15 eventually made our way into investigating the traffic stop

16 which would have been running them through dispatch.  Once all

17 that came back, I asked for consent to search the vehicle.  I

18 asked if there was anything illegal, weapons or narcotics in

19 the vehicle, they did not consent, and that's where Tanner

20 used his K-9, deployed his K-9 on the vehicle.

21 Q.   In terms of deploying the K-9, given your observations,

22 was it even necessary to deploy the K-9 at that point?

23 A.   No, I don't guess so.

24 Q.   Why not?

25 A.   Because, I mean, we already knew there was a drug

1    transaction, knew that there was narcotics in the vehicle.

2    Q.   After the K-9 alerted, what did you do?

3    A.   We pulled both subjects -- well, I pulled Mr. White out

4    on the driver's side, and Tanner would have pulled Mr. Welch

5    out on the passenger side.  And after removing Mr. White from

6    the vehicle, I was doing a pat down on him for weapons on the

7    driver's side of the vehicle, I was pulling him back towards

8    the back of the vehicle and Tanner was frisking Mr. Welch.

9    Q.   How would you describe Mr. Welch's demeanor, behavior

10   during his initial interactions with the defendant?

11   A.   He's mouthy; he's always mouthy.

12   Q.   During this initial pat-down period, did Mr. Welch do

13   anything that you interpreted as a threat?

14   A.   Not from what I saw, no.

15   Q.   Did Mr. Welch do anything you interpreted as aggressive?

16   A.   No.

17   Q.   If he had done any of those things, what would you have

18   done?

19   A.   Ran over and grabbed and helped.

20   Q.   After this initial interaction, what happened between the

21   defendant and Mr. Welch?

22   A.   From what I could hear over the top of the vehicle, as I

23   was at the back of the vehicle, from what I could tell was

24   Tanner was doing what we normally do, was frisking Mr. Welch

25   and he felt an abnormal object in his groin area, and at that

1    point, I remember -- from what I remember, Mr. Welch jerked

2    back and when he jerked back, he moved forward and that's

3    where, I assume Tanner punched him,

4    Q.   Okay.  Was it clear to you what led to Mr. Welch jerking

5    back from what you could observe?

6    A.   No.

7    Q.   Had you been with the defendant when he'd conducted pat

8    downs previously?

9    A.   Yeah.

10         MR. MORGAN:  Could we approach the bench, please,

11   Judge.

12         THE COURT:  Sure, come on up.

13       (Sidebar conference.)

14         MR. MORGAN:  Judge, I anticipate that this line of

15   questioning is going to be going toward this witness rendering

16   an opinion that he thinks that the defendant unnecessarily

17   gropes or grabs the groin area of suspects.  We've not been

18   provided any 404 notice of that.  Plus, I think it's improper

19   opinion testimony.

20         THE COURT:  All right.  At this point he's only asked

21   if he's observed him on other occasions conducting a search.

22         MR. DEMBO:  A pat-down search, yes, sir.

23         THE COURT:  Just based on his observations and not

24   expressing an opinion, so I'll overrule the objection based on

25   this is his observations as to whether this would be different

1    than other activities.

2         MR. DEMBO:  That's right.  Although, Mr. Morgan is

3    correct, that I was not going to elicit the earlier actions,

4    but that see if he had an opinion as to whether Mr. Abbott had

5    done anything unusual in this search, this pat down as in

6    anything to corroborate the grabbing of the groin in this

7    instance.

8         THE COURT:  Based on his training, he can't express

9    the ultimate opinion on the case.

10        MR. DEMBO:  Sure.

11        THE COURT:  But you can ask him his observations.

12        MR. DEMBO:  Thank you, Your Honor.

13        THE COURT:  Overruled.

14        (Conclusion of sidebar.)

15   BY MR. DEMBO:

16   Q.   Mr. Hopper, we were talking about that you observed the

17   defendant pat down other suspects previously; is that right?

18   A.   I have.

19   Q.   In this instance, was there anything you saw the

20   defendant do differently that might explain why Mr. Welch

21   might have jumped like that?

22   A.   No, he patted him down like he normally does.

23   Q.   Okay.  Now after Mr. Welch jumped, let me be clear, where

24   were you at the point leading up to the moment that Mr. Abbott

25   punched Mr. Welch?

*HOPPER - Direct*                                                    15

1    A.   In the back of the vehicle.

2    Q.   Were you able to see what was going on?

3    A.   Yes.

4    Q.   And in the moments before you saw the defendant punch

5    Mr. Welch, did you see Mr. Welch do anything aggressive

6    towards Mr. Abbott?

7    A.   I didn't observe it.

8    Q.   And if it had happened, would you have been able to see

9    it from your vantage point?

10   A.   Yes.

11   Q.   Did you see Mr. Welch do anything you'd characterize as

12   resisting?

13   A.   He wasn't putting one hand behind his back.

14   Q.   And when he was doing that, was he yanking his arm away?

15   A.   He was pulling a little bit.

16   Q.   Okay.  And was he swinging at the defendant?

17   A.   No.

18   Q.   Was he swinging his other arm?

19   A.   No.

20   Q.   Where was his other arm at the time?

21   A.   Hanging down by his side.

22   Q.   And had the defendant been able to put any cuffs on

23   Mr. Welch that you could observe?

24   A.   One.

25   Q.   Would you recall which arm he'd been able to cuff at that

1    point?

2    A.   I don't remember that.

3    Q.   Okay.   Prior to the defendant punching Mr. Welch, was one

4    of those cuffs on Mr. Welch's hand?

5    A.   Yes.

6    Q.   Was Mr. Welch doing anything you interpreted as

7    aggressive with the cuffed hand?

8    A.   No.

9    Q.   Was he doing anything you interpreted as aggressive with

10   the uncuffed hand?

11   A.   No.

12   Q.   Did you use any force on Mr. Welch in the moments leading

13   up to the defendant punching Mr. Welch?

14   A.   No.   When I walked up, I was just telling him to put his

15   hand behind his back.

16   Q.   Why did you walk up and tell him that?

17   A.   Because I didn't want it to escalate any more than it

18   already was.

19   Q.   What do you mean by that?

20   A.   I mean, it was mouthy from the get go, from the start,

21   and then once, when he jerked back and the punch happened, at

22   that point -- or actually that would have been prior, before

23   that, I just, I knew how it was going to go.   I knew the way

24   it was going between them mouthing back and forth, I just knew

25   it was going to escalate and I didn't want it to escalate

1    anymore.

2    Q.    What do you mean you knew how it was going to go?

3    A.    I knew that eventually, I mean, he was either going to

4    get punched or thrown to the ground, or whatever was going to

5    happen.   And at that point, there was, what I remember, there

6    was another male subject and a female subject that were

7    standing over there, and there's just a lot going on.

8    Q.    Now, based on your training that we've discussed, was it

9    consistent with your training for the defendant to punch

10   Mr. Welch in that moment?

11   A.    No.

12   Q.    What specifically about the situation went against the

13   training you told these jurors about from Danville, Boyle

14   County, and the academy?

15             MR. MORGAN:   Object to form, Judge.

16             THE COURT:   Overruled.

17   BY MR. DEMBO:

18   Q.    You can answer the question.

19   A.    I mean, we're frisking and putting somebody and trying to

20   place them into handcuffs, you have a vehicle right there in

21   front of you.   Normally, nine times out of ten, like, if

22   you're by a car or you're up against a hard wall, you use a

23   hard surface to use that for your ability to place somebody in

24   handcuffs.

25   Q.    So that brings up another good question.   Had you been

1  trained on ways to cuff individuals if they were resisting by

2  not giving you one of their hands?

3  A.   Yes.

4  Q.   You mentioned putting them up against a hard surface.

5  Was that one of those methods?

6  A.   Correct.

7  Q.   What specifically were you trained you could do if you

8  had an individual where you were having trouble cuffing one of

9  their arms?

10 A.   If you have access of one of their arms, use that to your

11 ability, and having that arm behind their back and placing

12 them up against the wall or the hard surface or whatever that

13 may be, in that case it would have been the vehicle, it just

14 gives you and advantage, you can use pressure points.

15 Q.   You mentioned pressure points, what is that?

16 A.   Just using the pressure points, I mean, in this case, it

17 would have been you can use them in your face, and you can use

18 them in your hand right here, and that just gains compliance

19 without hurting someone.  I mean, yeah, it's painful and it's

20 just temporary, you know, for five seconds, but it gives you

21 the time to get the person into custody.

22 Q.   Does use of pressure points, based on your training and

23 experience, typically result in injury?

24 A.   No.

25 Q.   You also mentioned that at the time this was happening,

1   you were at the back of the car; is that right?

2   A.   Yes.

3   Q.   If you had to approximate before you closed the distance,

4   about how far away were you?

5   A.   About five feet.

6   Q.   You were within ear shot of the defendant?

7   A.   Yes.

8   Q.   What, if anything, were you trained on asking for

9   assistance or backup if you had difficulty getting a suspect

10  into cuffs?

11  A.   I'm sorry, can you rephrase that again?

12  Q.   Sure.  Were you ever trained about asking for assistance

13  from available backup if there's another officer on the scene

14  if you're having trouble getting someone into cuffs?

15  A.   Yes.

16  Q.   Okay.  Did the defendant ever request your assistance in

17  getting Mr. Welch into cuffs?

18  A.   No.

19  Q.   In this training, were you ever trained that if you're

20  having difficulty getting one person's hands into a cuff, you

21  can punch them in the face?

22  A.   No.

23  Q.   After the defendant punched Mr. Welch, what happened?

24  A.   It escalated more than that, and then I ran over and went

25  to the ground at that point.

1    Q.   Who did you go to the ground with?

2    A.   Mr. Welch.

3    Q.   What happened between you and Mr. Welch on the ground?

4    A.   I was just rummaging around loose gravel, it's hard to

5    get friction when you're trying to get ahold of somebody in

6    the gravel.  I think I might have before said that I was

7    rolling around for, I mean, it seemed like forever, but I'm

8    sure it was just a short period of time.  I was able to get

9    his hand behind his back.

10   Q.   During that time that you were rolling around with

11   Mr. Welch, did you interpret what he was doing as a threat to

12   you?

13   A.   No, he was just pissed.

14   Q.   Did you get the sense that he was doing anything that

15   jeopardized your safety while you were there on the ground?

16   A.   No.

17   Q.   Were you ultimately able to cuff Mr. Welch?

18   A.   Yes.

19   Q.   How did the interaction on the scene end with you,

20   Mr. Welch, and the defendant?

21   A.   I mean, eventually when I got both of his hands behind

22   his back and got to place him in handcuffs, I mean, he was up,

23   he was mouthy, he was mad, and I put him in the back of my

24   truck.

25   Q.   Now, you later learned that the defendant had been

1    recording this incident on his phone; is that right?

2    A.   Later learned, yes.

3    Q.   And you've reviewed that footage previously; right?

4    A.   Yes.

5    Q.   Would you agree that some of what you told FBI and other

6    investigators initially was different than what was on that

7    video?

8    A.   Yes.

9    Q.   Why was that?

10    A.   Just memory issues from -- I mean, it was three years

11    ago.

12    Q.   As an initial matter, was it standard practice for BCSO

13    deputies to record law enforcement activities using their own

14    phone?

15    A.   No.

16    Q.   Did the Boyle County Sheriff's Office have body worn

17    cameras at that time?

18    A.   At that time, no.

19    Q.   If an officer did record some law enforcement interaction

20    on his or her phone, what was your understanding of what they

21    were supposed to do with whatever footage they obtained?

22    A.   Submit it as evidence.

23    Q.   In this incident involving Mr. Welch, who completed the

24    report and charges on Mr. Welch?

25    A.   I did.

1  Q.   And did the defendant ever submit this footage he had

2  taken on his cell phone to you as evidence to be included with

3  the report?

4  A.   Not to my knowledge, no.

5  Q.   Okay.  At this time we're going to watch a little section

6  of the video, the jury has watched a lot of it already so I

7  think we'll just watch a couple of clips of it to make things

8  shorter.

9        MR. DEMBO:  At this time, I'd like to publish to the

10  jury what's previously been admitted as Government

11  Exhibit 4-C, please, Your Honor.

12        MR. MORGAN:  No objection.

13        THE COURT:  Yes, it's been admitted, all of these

14  clips, the 4 series, may be shown if you wish.

15        MR. DEMBO:  Thank you, Your Honor.

16     If we could pull up 4-C, and Ms. Peel, if we could play

17  it in its entirety.

18     (Playing video.)

19  Q.   Having watched Government Exhibit 4-C, do you recognize

20  the defendant's voice?

21  A.   Yes.

22  Q.   What in that interaction was the one thing you heard the

23  defendant claim that Mr. Welch did during their interaction?

24  A.   By not putting his hand behind his back.

25  Q.   Um-hmm.  Is that the only thing that you heard him

1   claiming that Mr. Welch did?

2   A.   Yeah.

3   Q.   Did you ever hear him alleging that Mr. Welch was

4   aggressive towards him?

5   A.   No.

6   Q.   Did he ever allege that Mr. Welch aggressively advanced

7   on him?

8   A.   No.

9   Q.   Again --

10        MR. DEMBO:  Well, actually, I'll ask that in a

11  moment.  Let's turn to government Exhibit 4-D if we could, and

12  publish this to the jury, which is part of Government

13  Exhibit 4, but I don't think you-all have been able to see it

14  yet.

15        We could go ahead and play that, please, Ms. Peel.

16        (Playing video.)

17  Q.   Once again, in Government's 4-D, did you hear anything

18  the defendant claimed that Mr. Welch did aside from not giving

19  him his hand and yanking?

20  A.   No.

21  Q.   Do you recall seeing anything on the scene when you were

22  there indicating Welch had done anything to the defendant

23  other than not immediately obey his commands?

24  A.   No.

25  Q.   Now, at a certain point, the defendant asks, what else am

1    I supposed to do besides ask him 40,000 times?  Do you recall

2    hearing that?

3    A.   Yes.

4    Q.   And once again, he asked what, else am I supposed to do?

5    Ask him nicely, beg?  Do you recall hearing that?

6    A.   Yes.

7    Q.   Were you, as a BCSO deputy, taught other things you could

8    do beyond asking nicely and begging?

9    A.   Yes.

10   Q.   Are those some of those techniques you told the jury

11   about a moment ago in terms of ways to handcuff a resisting

12   suspect?

13   A.   Yes.

14   Q.   And once again, is it your understanding that BCSO and

15   policy permitted deputies to punch a suspect in the face

16   simply because he was refusing to put a single hand behind his

17   back?

18   A.   No.

19   Q.   Turning back to your memory of the evening, what happened

20   after Mr. Welch was taken into custody and placed in a car?

21   A.   On the scene?

22   Q.   Whatever you recall next, sir.

23   A.   I would have took him to the jail.

24   Q.   Okay.  And what was the drive with Mr. Welch like to the

25   jail?

1    A.   He was mad at Tanner.

2    Q.   Did he express any anger towards you?

3    A.   No.

4    Q.   Did anyone else speak with you while you were driving

5    Mr. Welch to the jail?

6    A.   I was received a phone call, or I might have called him,

7    I don't remember the circumstances, but I was on the phone

8    with Tanner.

9    Q.   And I think this call, did it continue through the time

10   that you made it to the jail?

11   A.   Yes.

12   Q.   What did the defendant talk to you about during this

13   phone call?

14   A.   Talked about the charges and the citation.

15   Q.   On Mr. Welch; is that right?

16   A.   Yes, sir.

17   Q.   What did the defendant initially tell you about the

18   charges and the citation?

19   A.   What the charge with.

20   Q.   Now, who is going to write this report?

21   A.   I was the one that was doing the report.

22   Q.   Whose idea was it that you were going to write the

23   report?

24   A.   It would have been my idea.

25   Q.   And was there any specific reason given that you weren't

1   the one who actually had the interaction with Mr. Welch, that

2   it was going to be you who was going to write the report?

3   A.   I think it was just where I was taking him to jail, I was

4   the one doing the report.

5   Q.   What did the defendant tell you about what charges he

6   wanted you to file against Mr. Welch?

7   A.   From my knowledge it was menacing, resisting, and

8   assault.

9   Q.   Assault on a law enforcement officer?

10  A.   (Nodding affirmatively.)

11  Q.   Now, did you actual write up all the charges that the

12  defendant told you to charge Mr. Welch with?

13  A.   Yes.

14  Q.   Did you charge him with assault on a law enforcement

15  officer?

16  A.   I don't know if it was in the report or not on the

17  assault charge.

18  Q.   I see.  Did you agree, based on your observations with

19  all of those charges that the defendant was proposing?

20  A.   Did I agree to it?

21  Q.   As in -- I'll ask it another way.  Based on what you

22  observed of Mr. Welch and your law enforcement training and

23  experience, did you believe Mr. Welch's conduct merited all

24  the charges that were being suggested to you by the defendant?

25  A.   I didn't feel comfortable charging him, no.

1    Q.   Why is that?

2    A.   Because it didn't meet the criteria of the charges.

3    Q.   What specifically bothered you about what you observed on

4    the scene versus the criteria of the charges the defendant was

5    telling you to charge Mr. Welch with?

6    A.   The behavioral factors.  Menacing, I mean, menacing is an

7    aggressive behavior that's in your face.

8    Q.   Had you seen Mr. Welch do anything that you thought was

9    an aggressive behavior in your face?

10   A.   Not that I saw, no.

11   Q.   And what about assault on a law enforcement officer?

12   A.   He didn't assault me, I didn't see him assault Tanner.

13   Q.   At this point I think I'm going to show you just for

14   identification, just to the witness, please, what's been

15   marked as Government Exhibit 5.

16        Do you recognize there document, sir?

17   A.   I do.

18   Q.   What is it?

19   A.   That's my arrest citation.

20   Q.   On Mr. Welch from that day?

21   A.   Yes, sir.

22        MR. DEMBO:  Your Honor, at this time, we would move

23   Government Exhibit 5 into evidence.

24        MR. MORGAN:  No objection.

25        THE COURT:  United States Exhibit 5 is admitted.

1          MR. DEMBO:  Thank you, Your Honor.

2      If we could publish this to the jury, please.

3          THE COURT:  Yes, sir.

4          MR. DEMBO:  So, Ms. Peel, if we could first pull up

5   and enhance the relevant charges, first on page 1 and then on

6   page 2 of the citation.

7   BY MR. DEMBO:

8   Q.   Could you just read off these charges that you ultimately

9   charged Mr. Welch with?

10  A.   Resisting arrest, disorderly conduct, second degree,

11  menacing, terroristic threatening, third degree.

12         MR. DEMBO:  Okay.  And if we could move to page two,

13  now, Ms. Peel and do same with the charges on that page.

14  BY MR. DEMBO:

15  Q.   If you could do the same here, Mr. Hopper?

16  A.   Trafficking in marijuana less than eight ounces, first

17  offense, drug paraphernalia, buy/possess, tampering with

18  physical evidence, and possession of a controlled substance

19  first degree, first offense methamphetamine.

20  Q.   Based on what you're seeing here, does this refresh your

21  memory as to whether you actually charged Mr. Welch with

22  assault on a law enforcement officer?

23  A.   Yes.

24  Q.   And did you?

25  A.   Yes.  No, I didn't, sorry.

1    Q.   That's okay.  Now, in the citation, along with the

2    charges, there's a narrative portion that's associated with

3    it; right?

4    A.   Yes.

5    Q.   What generally is the point of the narrative in the law

6    enforcement citation?

7    A.   The narrative just explains the elements of the crime

8    that was committed.  So I mean, every charge, I mean, normally

9    if it's charge one, you're going to start with -- I mean,

10    obviously you're going to do the preliminary, so what your

11    probable cause was for making contact with that person, and

12    you start with the first charge is normally how you would do

13    it, and starting from there.

14    Q.   Okay.  So we'll get to the narrative portion in just a

15    second, but we were talking a little bit about, for example,

16    why you felt menacing wasn't supported.  Going back to --

17         MR. DEMBO:  I think we'll go back to the charges on

18    the first page, please, Ms. Peel.  I don't know if it's

19    possible to do side by side, but if we can, that would be

20    ideal.  Thank you.  If we could blow up both of the charges.

21    BY MR. DEMBO:

22    Q.   Of these eight charges, are there any of these that,

23    based on your observations and what you knew, you felt weren't

24    appropriate or were not supported by what you observed on the

25    scene?

1   A.   The first four charges -- well, no, I'll take that back.

2   Maybe charge 1, 3, and 4.

3   Q.   Okay.  And talk to me about why you feel charges 1, 3,

4   and 4 weren't supported by what you observed on the scene?

5   A.   Because I didn't feel he was resisting, and menacing, I

6   never saw him menace, I just saw him pull away.  And

7   terroristic threatening, I think the only thing he said was, I

8   think he said something about telling Tanner to take his badge

9   off, is what I remember.

10   Q.   Why did you put these charges on your citation if you

11   felt that they didn't square with what you saw on the scene?

12   A.   Because, I don't know, I guess I wanted to make Tanner

13   look good and I didn't want him to get in trouble.

14   Q.   We'll come back to that in a second.

15        MR. DEMBO:  Let's blow up the narrative portion of

16   both of the pages of Government 5, Ms. Peel.  I don't know if

17   it's possible to do one on top of the other, but that would be

18   ideal.  Perfect.  Thank you.

19   BY MR. DEMBO:

20   Q.   Would you mind reading the narrative portion, please,

21   Mr. Hopper?

22   A.   From the top one?

23   Q.   Yes, please.

24   A.   Okay.  The above was passenger on traffic stop for minor

25   traffic violations.  Through the course of the stop, Deputy

1    Hopper asked the operator if there was any weapons or anything

2    illegal in the vehicle due to officer safety.  The operator

3    stated that there was not and denied consent to search the

4    vehicle.

5        Upon Deputy Hopper asking the operator for consent, the

6    operator was trying to find an insurance card for the vehicle.

7    K-9 Deputy Abbott deployed K-9 Aja on the vehicle.  Deputy

8    Abbott advised K-9 alert on the vehicle.

9        Upon pulling the above from the vehicle and search of his

10   person, Deputy Abbott felt and observed he believed a glass

11   pipe in the back of the above's pants.  Upon attempting to

12   place the above in handcuffs and getting one hand cuffed, the

13   above became actively resistant, pulling away.  Deputies

14   advised the above multiple times to put his hands behind his

15   back and the above would not comply.

16       The above then made an aggressive advancement towards

17   Deputy Abbott in which Deputy Abbot used a hard empty hand

18   technique and taken to the ground to gain compliance.  Upon

19   search of the vehicle, a grocery baggie with a green leafy

20   substance, suspected marijuana, was located in the front

21   pocket of a white jacket in the back seat.

22       Located in the back seat by the white jacket was a large

23   sized Ziplock baggie with several small Ziplock baggies with a

24   green leafy substance, suspected marijuana.

25       Also located in a large Ziplock baggie was a Cattleman's

1    cup.   Inside the cup was a green leafy substance.   The

2    operator stated he just left work at Cattleman's and was

3    wearing the uniform.

4        Also located in the back seat was another Ziplock baggie

5    with a green leafy substance suspected marijuana.

6        Upon arrival at the jail the above retrieved a glass

7    smoking pipe and baggie containing suspected methamphetamine.

8    On scene at the jail, the above advised, in quotation, Deputy

9    Abbott wasn't shit without his badge and that he'd whip his

10   ass.

11   Q.   You wrote this narrative portion; is that right,

12   Mr. Hopper?

13   A.   I did.

14   Q.   Was this narrative supporting the citation completely

15   truthful and accurate?

16   A.   No.

17   Q.   Could you please go through the narrative and point out

18   to the jurors any portions that were not truthful and

19   accurate?

20   A.   The sentence of placing him in handcuffs.

21   Q.   And what specifically about that sentence is not

22   accurate?

23   A.   Upon pulling them both from the vehicle, and search of

24   his person, there was a glass pipe.   Upon attempting to place

25   the above in handcuffs and getting one in cuffs, actively

1    resistant pulling away, the aggressive advancement towards

2    Deputy Abbott and him going to the ground.

3    Q.   Okay.  So you just listed a couple of things.  Could you

4    just go through and just say what phrase or word is not

5    accurate and why it is not accurate?

6    A.   Mr. Welch making an aggressive advancement.

7    Q.   Okay.  Were you watching the interaction between the

8    defendant and Mr. Welch?

9    A.   I was.

10    Q.   Did you at any point see him make an aggressive

11    advancement?

12    A.   I did not.

13    Q.   Why did you put that in here if it wasn't true?

14    A.   Because I was on the phone with Tanner.

15    Q.   And whose idea was it to put that phrase in the citation?

16    A.   I mean, I wrote the citation, but he was telling me what

17    to put in the citation.

18    Q.   So why then, because you were on the phone with him, did

19    you simply take what he was telling you to put and write it in

20    your own citation?

21    A.   Yes.

22    Q.   Why did you do that?

23    A.   Because me and Tanner were close.

24    Q.   Well, let me ask it this way.  If you had put the truth

25    of what you'd observed in the citation, what were you worried

1  might happen?

2  A.  Get in trouble.

3  Q.  Why?

4  A.  Because it wasn't true.

5  Q.  I guess what I mean is, let's say you had put in the

6  citation what you just testified to this jury about Mr. Abbott

7  punching Mr. Welch for a reason that you didn't think was

8  legitimate.  What do you think -- what were you worried would

9  happen if you wrote that in your report instead of what the

10  defendant was telling you to write?

11  A.  He would have got in trouble.

12  Q.  And why did you care about that?

13  A.  Because he was my friend.

14  Q.  What should you have done when the defendant called you

15  and told you what to put in your citation?

16  A.  I should have put in my citation what I thought was what

17  happened.

18  Q.  Now, when you were interviewed by the FBI, you didn't

19  initially tell them about this false report, did you?

20  A.  No.

21  Q.  Why didn't you?

22  A.  Because I don't remember.

23  Q.  One other thing about this report --

24       MR. DEMBO:  If we could take down the zoom and zoom

25  in on the bottom right portion there, Ms. Peel, the little box

1    right around the label.

2    Q.   Now, the exhibit label is obscuring a little bit of this

3    box, but you're able to see this text over here on the left of

4    the bottom right of Government Exhibit 5, page 1; is that

5    right?

6    A.   Yes.

7    Q.   And you're familiar with the purpose of this box; is that

8    right?

9    A.   Yes.

10   Q.   What is the point of this box on the citation label?

11   A.   The top box says, video, so I mean, normally if we had

12   body camera or dash camera footage, that's usually the box you

13   would check.

14   Q.   And if you had been provided video from the stop, would

15   this be where you would have notated it?

16   A.   Yes.

17   Q.   Were you provided any video from this stop?

18   A.   I was not.

19   Q.   Did you even recall, until the FBI showed it to you that

20   the defendant had been filming this on his own phone?

21   A.   No.

22        MR. DEMBO:   Okay.  We can take that down, Ms. Peel,

23   thank you.

24   Q.   Were you also present for an interaction between the

25   defendant and a man named Brent Thomas on or about March 31st

*HOPPER - Direct*                                                                 36

1    of 2021?

2    A.   Yes.

3    Q.   Where did that interaction happen?

4    A.   The interaction took place at a hotel in Harrodsburg,

5    Kentucky.

6    Q.   What were the circumstances leading up to the interaction

7    with Mr. Thomas?

8    A.   What I learned later was Tanner had fresh charges on

9    Mr. Thomas -- pending charges, I apologize.

10   Q.   That's okay.  Sure.  What does fresh charges or pending

11   charges mean?

12   A.   To my knowledge is that Tanner had felony charges on him

13   from a prior engagement and that would have been what it was

14   about.

15   Q.   From what you were able to learn later, did you have any

16   idea of why the defendant had charges on Mr. Thomas but had

17   not actually arrested him for those charges?

18   A.   No.

19   Q.   Okay.  To your knowledge, when you showed up to that

20   hotel in Harrodsburg that day, did the defendant have an

21   arrest warrant for Mr. Thomas?

22   A.   No.

23   Q.   When you showed up to that hotel room that day, was it

24   your impression that the defendant had a search warrant for

25   Mr. Thomas's hotel room?

1  A.  No.

2  Q.  Did you have either an arrest warrant or search warrant

3  for Mr. Thomas's hotel room?

4  A.  I didn't know what was going on.

5  Q.  Were there any other law enforcement with you there that

6  day during the interaction with Mr. Thomas?

7  A.  No, it was just me and Tanner.

8  Q.  What happened after you and the defendant reached

9  Mr. Thomas's hotel room?

10  A.  We went up to the room, and I remember when we were up at

11  the room we had knocked on the door, and when nobody was

12  coming to the door, went down to the front desk and Tanner

13  retrieved a key from the manager or whatever, the person, the

14  clerk.

15  Q.  That's okay.  Let me just stop you and ask a detailed

16  question about what you just said.  You said you knocked on

17  the door.  What, if anything did the defendant do to identify

18  himself when he knocked on the door?

19  A.  Didn't identify himself.

20  Q.  What, if anything, did he do to identify you-all as law

21  enforcement?

22  A.  He didn't.

23  Q.  What, if anything, did he do to try to prevent the person

24  inside from being able to tell what was going on outside?

25  A.  He didn't.

1  Q.   Was there a peep hole or some other --

2          MR. MORGAN:  Objection, Judge.

3          THE COURT:  I'm sorry, what's the nature of the

4  objection?

5          MR. MORGAN:  I think -- may we approach the bench,

6  please?

7          THE COURT:  Certainly.

8      (Sidebar conference.)

9          MR. MORGAN:  With all due respect, I think that

10  counsel is not getting the answer that he was wanting and so

11  he's just trying to lead him into saying that he covered --

12  the defendant covered the peep hole with his finger in which

13  he said in his opening.  This witness has not verified that

14  and now he's getting ready to say, did he cover the peep hole.

15          THE COURT:  You asked can what, if anything, did he

16  do --

17          MR. MORGAN:  And he said --

18          THE COURT:  -- for detection.

19      The objection is overruled.  It's a proper question.

20          MR. DEMBO:  Thank you, Your Honor.

21      (Conclusion of sidebar.)

22          THE COURT:  The objection is overruled, ladies and

23  gentlemen.

24      You can re-ask the question if you can recall how it was

25  phrased.

1    MR. DEMBO:  Yes, thank you, Your Honor.

2    BY MR. DEMBO:

3    Q.    On this hotel door, what, if any, way there for the

4    occupants of the hotel room to be able to see what was going

5    on in the hallway?

6    A.    Couldn't have.

7    Q.    There was no means for the occupant to see into the

8    hallway?

9    A.    No.

10   Q.    Okay you also mentioned that the defendant went down to

11   the hotel manager; is that right?

12   A.    Yeah, we both did.

13   Q.    During that interaction, what was your -- what did the

14   defendant say to the hotel manager that led to getting the

15   key?

16   A.    I think he just stated about somebody he was looking for

17   and had to do with narcotics.

18   Q.    Based on your understanding of BCSO training and policy,

19   were you permitted to ask for someone's hotel key without a

20   warrant or without any other reason for entry into the room?

21   A.    No.

22   Q.    After obtaining the hotel key, what's the next thing that

23   happened?

24   A.    We went up to the door, and from what I remember, Tanner

25   slid the key in the door, and once the door opened, it hit a

1   chain latch when the door opened, and when the door latched,

2   that's when Brent came to the door and was yelling at Tanner

3   and they were exchanging in conversation at that point.

4   Q.   So when you said after he entered the key, the door

5   opened, who opened the door?

6   A.   When Tanner slid the key in the door, that's when he

7   pulled the door, that's when it opened, that's when it hit the

8   latch from the inside.

9   Q.   So in other words, I'm just trying to say, to your

10  impression, it was not any of the occupants in the room that

11  opened the door?

12  A.   Not to my knowledge, no.

13  Q.   Okay.  You mentioned then it hit a latch and then he and

14  Mr. Thomas began exchanging words?

15  A.   Yes.

16  Q.   What happened after that?

17  A.   Eventually Mr. Thomas came out in the hallway and when he

18  came out in the hallway, I patted him down for weapons and

19  illegal contraband on his person.  And that's just what I

20  remember when I was patting him down, I was putting his

21  objects up against the wall, or next to the room.  We were

22  there for, I don't know a short period of time, and they were

23  engaging in their conversations about, I guess, about what

24  Brent did and didn't do, and then after that point, we were in

25  the hotel room.

1    Q.   Well, before we get to the hotel room, let me ask, when

2    the defendant and Mr. Thomas ended up in the hallway, what was

3    Mr. Thomas's demeanor?

4    A.   His demeanor was just -- I mean, he was mouthy with

5    Tanner, but other than that, I mean, he wasn't showing any

6    signs of aggression.  And from what I remember, he had, like,

7    a medical cast boot on his leg, so he didn't really get around

8    very well.

9    Q.   So also, did you know Mr. Thomas before this or no?

10   A.   I've dealt with him a couple times.

11   Q.   Do you have a guess for how old he might be?  Is he a

12   young guy, old guy?

13   A.   I would say, mid age, I would say 50s, maybe 40s.

14   Q.   What about his physical size, how would you compare it to

15   that of say the defendant's?

16   A.   I don't know, I just remember him from being skinny

17   stature.

18   Q.   Okay.

19   A.   Lanky.

20   Q.   Now, you mentioned out in the hallway you conducted a pat

21   down.  Did you locate any items on Mr. Thomas?

22   A.   Not anything illegal, no, just normal items you find on

23   somebody.

24   Q.   And were those items taken away from him and -- were the

25   items taken away from him after you patted him down?

1    A.    They were taken away, I mean, certain things he could

2    have put back in his pocket, but --

3    Q.    After that, what, if anything, was preventing you and the

4    defendant from arresting Mr. Thomas and leaving the hotel?

5    A.    Nothing.

6    Q.    What was your understanding of the whole reason you went

7    to the hotel room in the first place?

8    A.    I thought it was to go and arrest him for pending charges

9    was what I was under the belief of.

10   Q.    Was there anything you were able to see in that moment

11   that prevented you from achieving that goal?

12   A.    No.

13   Q.    Did the defendant arrest Mr. Thomas in that moment and

14   leave?

15   A.    No.

16   Q.    What did he do instead?

17   A.    Went inside the hotel room.

18   Q.    In the moment that he went inside the hotel room, did you

19   ever hear the defendant ask Mr. Thomas for consent to enter

20   the hotel room?

21   A.    I didn't.

22   Q.    Did you ever hear Mr. Thomas give consent to enter the

23   hotel room?

24   A.    I didn't hear it.

25   Q.    Once you entered the hotel -- well, I should say once the

1    defendant entered the hotel, what did you do?

2    A.   When they walked in I was walking behind them, so when I

3    walked in, I mean, it was just a hotel room.  You walk in, the

4    bathroom on the right, so I was just, you know, making sure

5    everything was good and everything was safe for officer safety

6    reasons.

7         And once I got to the bathroom and I got to the closet

8    right there, the coat closet, I stopped right there, because I

9    mean, after that point, it was open area room.  It was two

10   beds, I remember there was a female sitting on the bed and

11   Mr. Thomas sat on the bed.

12   Q.   Now, you mentioned there was a female sitting on the bed.

13   Did you have any indication previously from being in the

14   hallway that there was a female in there?

15   A.   No.

16   Q.   Did you have any knowledge that anyone else was in that

17   room while you were out in the hallway?

18   A.   Not to my knowledge, no.

19   Q.   Did the defendant say anything about Mr. Thomas having

20   someone else in the room with him?

21   A.   Not to my knowledge.

22   Q.   And when you talked with Mr. Thomas, did he say anything

23   about having someone else in the room with him?

24   A.   Not that I remember.

25   Q.   I guess this is probably an obvious answer then, but did

1    you ever hear the defendant ask the female occupant of the

2    hotel room for consent to search the room?

3    A.   No.

4    Q.   And did you ever hear the female occupant at any point

5    suggest he had consent to search the room?

6    A.   No.

7    Q.   Once inside, did you ever hear the defendant saying

8    anything about Mr. Thomas violating some kind of court order?

9    A.   No.

10   Q.   Did you ever hear the defendant at any point claim

11   because there was this female in the room, that somehow

12   allowed him to go into the hotel room?

13   A.   Huh-uh, no.

14   Q.   Thank you.  So you mentioned that you did a sweep and

15   then stood near the closet; is that right?

16   A.   Yes.

17   Q.   And Mr. Thomas and the female were on the bed; is that

18   right?

19   A.   Correct.

20   Q.   What was the defendant doing during this time?

21   A.   After he started -- after he was talking to Mr. Thomas

22   for a brief second, they were exchanging about, I would assume

23   Mr. Thomas not working or doing, I guess, he told Tanner that

24   he was going to do, and at that point, Tanner started

25   searching the room.

1  Q.   So let me ask you a question.  What do you mean when you

2  say, your understanding of the conversation between the

3  defendant and Mr. Thomas was about Mr. Thomas not working,

4  what was your interpretation of that discussion?

5  A.   My understanding would be that, I guess, he had the

6  charges on Brent, and Brent told him that he was going to work

7  his charges off and didn't.

8  Q.   And what, based on your experience and training in BCSO,

9  does it mean to work off charges?

10  A.   I guess when you're getting out with somebody and you

11  arrest them for felony drug charges, I mean, I guess you use

12  them to -- when working off the charges, I guess, getting

13  bigger drug dealers, is what I would assume.

14  Q.   So was it your impression in that discussion that the

15  defendant had been trying to get Mr. Thomas to be a

16  confidential informant?

17  A.   Yes.

18  Q.   Now, you mentioned then, the defendant began searching

19  the hotel room.

20  A.   Yes.

21  Q.   What specifically did you see him do?

22  A.   Where the entertainment center was, there was bags and

23  drawers and he was going through all that.

24  Q.   What exactly was he doing to the bags and drawers?

25  A.   Unzipping them and going into them.

1    Q.   Was he opening the drawers as well?

2    A.   Yes.

3    Q.   Are you familiar with what's called search incident to

4    arrest?

5    A.   I am.

6    Q.   Based on your training and experience, in laymen's term,

7    what is a search incident to arrest?

8    A.   When you're placing somebody into custody, you do a

9    search of their person and the area where they're occupied.

10   Q.   Based on your training and experience, does a search

11   incident to arrest mean you're allowed to search the entire

12   area?

13   A.   No.

14   Q.   And had you, in fact, already done a search incident to

15   arrest on Mr. Thomas's person when you patted him down in the

16   hallway?

17   A.   Yes.

18   Q.   Was what the defendant was doing that you observed in the

19   hotel room when he was moving the bags and opening the

20   drawers, consistent or inconsistent with your understanding of

21   what a search incident to arrest was?

22   A.   Inconsistent.

23   Q.   Why?

24   A.   Because when I patted him down in the hallway I was under

25   the knowledge that we were going to arrest him just for that.

1   And that's where I was confused is why didn't the arrest take

2   place in the hallway?  Once we went across the threshold of

3   the door, I mean, at that point, I mean, nothing was in plain

4   view.  So there was no narcotics in plain view and that

5   doesn't give you the reason to search that room.

6   Q.   What was your internal reaction to seeing the defendant

7   going through Mr. Thomas's bags and drawers?

8   A.   My internal reaction?

9   Q.   Yes, sir.

10  A.   I didn't want to be there anymore.

11  Q.   Why not?

12  A.   Because it was an unlawful search.

13  Q.   Did you say anything to the defendant at the time?

14  A.   I don't remember, no.

15  Q.   During this search, did Mr. Thomas or the female say

16  anything to the defendant at the time?

17  A.   Not that I remember.

18  Q.   Did the defendant find anything during this search?

19  A.   He did.

20  Q.   Do you recall what he found?

21  A.   I think he found two bags of methamphetamine.

22  Q.   What did the defendant do after he found these things

23  during the search?

24  A.   He walked over and told Brent to stand up and was trying

25  to place him in handcuffs.

HOPPER - Direct                                                    48

1    Q.   And what happened when he told Brent Thomas to stand up?

2    A.   Brent was getting mouthy, and that's about all I

3    remember.

4    Q.   Do you remember when Mr. Thomas was getting mouthy with

5    the defendant him ever doing anything that you interpreted as

6    aggressive?

7    A.   No.

8    Q.   Did he do anything you interpreted as a threat?

9    A.   No.

10   Q.   Did you have a clear view of the interaction between

11   Mr. Thomas and the defendant?

12   A.   I did.

13   Q.   What happened next?

14   A.   When he stood up and Tanner was trying to place his hands

15   behind his back, he was, like I said, he was being mouthy and

16   he was confused and was wondering, I guess, what was going on.

17   And he did a slight pull and that's when Tanner slung him by

18   his arm into the wall.

19   Q.   So what specifically did you see the defendant do to

20   Mr. Thomas when you say he slung him by his arm into the wall?

21   A.   He grabbed him by his arm, he had him like this to have

22   control of him and he swung him around, spun him, and he went

23   face first into the wall.

24   Q.   What were you are able to see make contact on Mr. Thomas

25   with the wall?

1   A.   His face.

2   Q.   Was Mr. Thomas able to put his hands out at all to --

3   A.   He didn't have enough time to react.

4   Q.   Did it make any noise when Mr. Thomas hit the wall?

5   A.   A loud thump.

6   Q.   In those moments, prior to the defendant doing this, did

7   you use force on Mr. Thomas at all?

8   A.   I didn't.  I remember when this was going on, the female

9   started becoming hysterical so I walked over and was trying to

10  calm her down.

11  Q.   Based on everything you observed, was it consistent with

12  BCSO practice and training for the defendant to throw

13  Mr. Thomas into the wall?

14  A.   No.

15  Q.   Are you familiar with the concept of placing someone

16  against a wall in order to more easily handcuff them?

17  A.   Yes.

18  Q.   Did it appear to you that that was what the defendant was

19  doing in that moment?

20  A.   I don't know if that's what he was trying to do, but

21  that's -- no.

22  Q.   Why did it not appear that way to you?

23  A.   I mean, you could have just, you know, shrugged into him

24  and put him up against the wall.  I mean, like I said, it was

25  just he slammed him in the wall.

1   Q.   To your memory, had the defendant even attempted to cuff
2   Mr. Thomas at this point?
3   A.   I think he was trying to put him in handcuffs, yes.
4   Q.   And had he requested your assistance in helping in any
5   way?
6   A.   No.
7   Q.   Did he say anything to you prior to throwing Mr. Thomas
8   into the wall?
9   A.   No.
10  Q.   What was your internal reaction to seeing the defendant
11  throw Mr. Thomas into the wall?
12  A.   I didn't agree with it.
13  Q.   Why not?
14  A.   Because it just wasn't something I would have done.  Like
15  I said, I think that all would have been over if he would have
16  gone in handcuffs in the hallway.
17  Q.   What did you do after seeing that?
18  A.   After that, we kind of mosey out towards the hallway and
19  I got a call and I left.
20  Q.   When you say you got a call, what do you mean?
21  A.   A call for service, like, I got another call on the
22  radio.
23  Q.   Why didn't you stay around with the defendant and
24  Mr. Thomas?
25  A.   From what I remember, I think we walked out towards his

1 patrol car and he was putting Mr. Thomas in the back of the

2 car and that's when I left.

3 Q. Did the defendant ever show you the citation he wrote on

4 Mr. Thomas from that day?

5 A. I never saw it, no.

6 Q. Did you ever see it from the FBI?

7 A. Yes.

8 Q. I'm going to show you what's been previously marked as

9 Government Exhibit 6.

10     MR. DEMBO: Just for the witness, please.

11 Q. Do you recognize this document, sir?

12 A. I do.

13 Q. What is it?

14 A. It's the arrest citation for Mr. Thomas.

15 Q. And is that the arrest citation from the date and

16 incident we've been talking about?

17 A. Yes.

18     MR. DEMBO: At this point we would move to admit

19 Government 6, Your Honor.

20     MR. MORGAN: No objection.

21     THE COURT: United States Exhibit 6 will be admitted,

22 it may be displayed.

23     MR. DEMBO: Thank you, Your Honor.

24   If we could first blow up the case portion at the very

25 bottom, Ms. Peel. Thank you.

1    BY MR. DEMBO:

2    Q.   Based on what you're seeing, who authored this report?

3    A.   Tanner.

4    Q.   Sorry?

5    A.   Tanner Abbott.

6    Q.   And who is listed as a witness?

7    A.   I am.

8         MR. DEMBO:  All right.  Ms. Peel, if we could blow up

9    the citation portion of this report.  I'm sorry, the narrative

10   portion of this report, the whole thing is a citation, sorry.

11   Q.   Mr. Hopper, if you could just read the narrative portion

12   for me, please?

13   A.   On the above date and time, deputies made contact with

14   the above due to pending charges.  Upon contact, the above was

15   willing to corporate with deputies and gave them consent to

16   search his room, number 203.  Deputies found in the room two

17   bags containing believed methamphetamine and a bag containing

18   marijuana and a digital scale.

19   Q.   Based on what you observed that day, is this narrative an

20   accurate description of what happened?

21   A.   No.

22   Q.   Why not?

23   A.   Because it just lists what he found and what would have

24   been the reasons that we would have been there.

25   Q.   Well, what words or phrases specifically do not square

1    with what you observed that day?

2    A.   Consent.

3    Q.   What do you mean by that?

4    A.   By the above or Mr. Thomas giving consent to search room

5    203.

6    Q.   And why are you saying that this portion of the narrative

7    doesn't square with what you recall?

8    A.   Because I don't remember him consenting.

9    Q.   Were you present for all of the defendant's interactions

10   with Mr. Thomas?

11   A.   Yes.

12   Q.   During this incident, I should say?

13   A.   Yes, this incident, yes.

14   Q.   So if Mr. Thomas had, in fact, given consent, would you

15   have heard that?

16   A.   Yes.

17   Q.   Did you ever hear the defendant on the scene ever claim

18   to you that he had consent to access the room?

19   A.   No.

20   Q.   When he went down to talk to the hotel manager, did you

21   hear him claim to the hotel manager he had consent to access

22   the room?

23   A.   No.

24   Q.   Did the defendant ever talk to you before he wrote this

25   citation?

HOPPER - Direct                                                          54

1   A.   Not to my knowledge, no.

2   Q.   Did you ever know that he'd claimed that Thomas had given

3   him consent before writing this report?

4   A.   Huh-uh.

5   Q.   The last sentence of the exhibit says, Deputies found in

6   the room two bags.  Was there anyone there other than you and

7   the defendant?

8   A.   No.

9   Q.   Did you do any search of the room?

10  A.   No.

11  Q.   Did you find two bags containing methamphetamine?

12  A.   I did not.

13  Q.   Who was the only person who searched that hotel room that

14  day?

15  A.   Tanner.

16          MR. DEMBO:  Okay.  We can take that down, Ms. Peel.

17  Q.   Finally, did you at some point come on a scene in January

18  of 2021 involving an interaction between the defendant and two

19  kids named Destin Newman and Clay Ballard?

20  A.   I did.

21  Q.   Now, to be clear, were you there for any use of force by

22  the defendant?

23  A.   I was not.

24  Q.   And so you don't have any personal knowledge as to what

25  happened before you arrived on the scene; is that right?

1    A.   I do not.

2    Q.   How is it that you came to be on the scene of this

3    traffic stop?

4    A.   I was notified by Danville dispatch.

5    Q.   Was there anything unusual about the fact you were

6    notified by Danville dispatch?

7    A.   I don't remember what I was doing at the time, but I --

8    they notified me and let me know that -- or I might have asked

9    them on the radio what he was out on, but I don't remember any

10   radio traffic being transmitted of the beginning of it.

11   Q.   Did that strike you as unusual at all?

12   A.   It was odd.

13   Q.   Why was it odd?

14   A.   Because normally you give it out over the radio.

15   Q.   What do you mean when you say, give it out over the

16   radio, what do you mean by that?

17   A.   Like when you get out with a vehicle, you broadcast or

18   transmit it towards dispatch to let her know where you're at

19   and what you're out with.

20   Q.   And when you say that's what you do, is that how you had

21   been trained?

22   A.   I guess you could say that, yes.

23   Q.   What were the reasons why you would put that out over the

24   radio when you were out on a traffic stop?

25   A.   Well, I mean for one, it's CAD purposes, I mean, it's all

1    documented, but I think what I learned is that he was on the

2    phone, but I didn't know about it.  That's what I'm testifying

3    to is I didn't know about it.

4    Q.   Meaning you didn't know that he'd initiated a traffic

5    stop?

6    A.   I did not.

7    Q.   You said something a second ago about CAD and that it's

8    documented.  What is CAD?

9    A.   CAD is just like where you let dispatch know what you're

10   doing, and like I said, everything -- it's a document, that

11   is -- I guess what I'm trying to say is it's -- I don't now

12   how else to put it.

13   Q.   You said something about it being documented, is the

14   reason you said that, is that one of the understandings that

15   the reason you put it out over the radio is so that it is

16   documented in the CAD?

17   A.   Yes.

18   Q.   And so if it is not put out over the radio, is there a

19   risk it would not be documented in the CAD?

20   A.   I mean, it could, but like I said, if he's on the phone,

21   it could still be the same way.

22   Q.   Sure.  And you're saying after the fact, you learned that

23   he claimed he was on the phone; is that right?

24   A.   Correct.

25   Q.   You certainly have no personal knowledge as to whether or

1    not that conversation occurred?

2    A.   I don't.  I don't.

3    Q.   Okay.  Now, after you came on the scene, what did you

4    observe in the traffic stop?

5    A.   When I rolled up, I think Tanner was talking to an

6    officer from Danville, and I seen a car in the ditch.  Yeah,

7    it was a car in the ditch and I saw two, looked like young

8    teenagers was sitting in the ditch and both of them had blood

9    on their face.

10   Q.   What, if anything, did the defendant tell you had

11   happened before you arrived on scene?

12   A.   From what I remember, Tanner was -- when I showed up and

13   I was asking, you know, what was going on and what he had,

14   which is normally what you do, he was sitting there talking to

15   the officer from Danville and what I remember is Tanner kept

16   showing me his hand and was laughing.

17   Q.   What was the purpose of him showing his hand?

18   A.   I don't know, I just -- I don't know.

19   Q.   Did you have any idea as to why he was laughing?

20           MR. MORGAN:  Objection.

21           THE COURT:  Unless there was a statement made or you

22   are able to infer that.  Are you able to do so based on a

23   statement or any inference, are you able to say why that was

24   done, why he was laughing?

25           THE WITNESS:  No.

1   THE COURT:  All right.  You're not required to

2   answer.

3   BY MR. DEMBO:

4   Q.   What was his demeanor and attitude when you saw the

5   defendant?

6   A.   Like I said, he was laughing.

7   Q.   Did he ever tell you anything about what he claimed those

8   two teenagers, as you described them, did prior to you

9   arriving on scene?

10  A.   He said that one resisted and the other one, I guess,

11  when he was dealing with the other one, I guess, tried to get

12  involved, is what I remember.

13  Q.   Did he ever tell you anything about either of them being

14  aggressive towards him?

15  A.   I think he mentioned something about one of them tried

16  fighting him.

17  Q.   Did the defendant later text you about this incident?

18  A.   Yes, I found out later, yes.

19       MR. DEMBO:  Okay.  I'm going to show just the

20  witness, please, Madam Clerk, what's been marked as

21  Government's Exhibit 15.

22  Q.   And we may, are you able to read that from where you are,

23  sir?

24  A.   I can read it.

25  Q.   Okay.  Do you recognize what this is?

1    A.   I do.

2    Q.   And what is it?

3    A.   It's text message conversation between me and Tanner.

4    Q.   Okay.  And does this have to do with the incident we've

5    just been talking about involving these two teenagers?

6    A.   It does.

7         MR. DEMBO:  Okay.  Your Honor, at this time, I would

8    move to admit Government's 15.

9         MR. MORGAN:  No objection.

10         THE COURT:  United States Exhibit 15 is admitted.  It

11   may be shown to the jury if you wish.

12         MR. DEMBO:  Thank you, Your Honor.  Yes, if we could

13   publish that to the jury.

14   BY MR. DEMBO:

15   Q.   And as you mentioned, Mr. Hopper, this is a text

16   conversation between you and the defendant; is that right?

17   A.   Yes.

18         MR. DEMBO:  If we could blow up the green text

19   message there, Ms. Peel.

20   Q.   Who appears to be the author of this text message?

21   A.   Tanner.

22   Q.   And could you read it for me, please?

23   A.   It says, That kid that don't do drugs that I just beat up

24   for no reason.  And it's got a picture of, looks like THC

25   pods.

1  Q.   Okay.  And you're saying, based on both your memory and

2  your experience, those appear to be THC pods in the

3  attachment; is that right?

4  A.   Yes, that's what it appears to be.

5         MR. DEMBO:  Okay.  We can take that down, Ms. Peel,

6  thank you.

7  Q.   When did you and the defendant start to have a falling

8  out?

9  A.   I remember it was, I guess, in the early months of 2021.

10 Q.   Why did you have a falling out?

11 A.   Like I said earlier, I just didn't agree on how he was,

12 and I mean, I just separated myself.

13 Q.   When you say you didn't agree on how he was, was that a

14 conflict with how he was personally?

15 A.   It was work and personal.

16 Q.   Okay.  And tell the jury a little more what you mean

17 without going into any specifics beyond what we've talked

18 about today.

19 A.   I just didn't like how he treated people, I just -- it

20 was the narcissism and I just, I started separating myself and

21 I didn't want to be around it no more.

22 Q.   What did you do to separate yourself?

23 A.   I requested to my supervisors to be on a different

24 rotation, and then after a while, on every Thursday we had, we

25 called it fat day and everybody had to work together, every

1   rotation worked, and that's when they put me on days.  So I

2   went to day shift and I cut out communication with him.

3   Q.   After cutting out communication, did you-all have any

4   confrontations?

5   A.   There was no confrontation, no.  There was one time we

6   talked in the evidence room in the sheriff's office.

7   Q.   What happened during that conversation?

8   A.   I was in the evidence room and he come in and started to

9   shut the door and said we needed to have a conversation.  I

10   told him I didn't want to have any conversation, I had nothing

11   I wanted to say to him.  And we stood there and talked for a

12   little bit, and that was the end of it.

13   Q.   Before you had a falling out and cut out conversation or

14   discussion with the defendant, did the defendant send you any

15   other texts that stick out in your mind that could be

16   relevant?

17   A.   Before we had a falling out?

18   Q.   Yes, sir.

19   A.   Yeah, there was a group message text that was sent out.

20   Q.   Okay.  I'm going to show you what's marked as Government

21   Exhibit 7.

22        MR. DEMBO:  And I'm sorry, again, Madam Clerk, just

23   for the witness, first.

24   Q.   If we could go to page two of that.  Do you recognize

25   there text, sir?

1    A.   I do.

2    Q.   Is this the group message text you were referring to?

3    A.   It is.

4    Q.   Who sent this text?

5    A.   It says from Tanner Abbott.

6    Q.   And were you one of the members of the group that

7    received this text?

8    A.   I was.

9         MR. DEMBO:  Your Honor, at this time we would move to

10   admit Government 7.

11        MR. MORGAN:  No objection.

12        THE COURT:  United States Exhibit 7 is also admitted

13   and may be shown.

14        MR. DEMBO:  Thank you.  I'll publish that to the jury

15   if we could, Madam Clerk.  Thank you.

16   BY MR. DEMBO:

17   Q.   Now, as an initial matter, we can see a small photo

18   there.  Was that a photo that was sent from the defendant?

19   A.   Yes.

20        MR. DEMBO:  Ms. Peel, are you able to pull up

21   Government --

22        Well, I should add I also moved to admit Government 7-A,

23   which is a larger version of the photo in Government 7.

24   Sorry, I should have said that earlier.

25        THE COURT:  Any objection?

1              MR. MORGAN:  No objection.

2              THE COURT:  Was the date mentioned on this document

3      as to when the message would have been sent?

4              MR. DEMBO:  It is mentioned on the document, Your

5      Honor, we can blow it up if you want.

6      BY MR. DEMBO:

7      Q.  Are you able to read on the Cellebrite there, when this

8      message was sent, Mr. Hopper?

9      A.  It says 4/15/2021 at 4:24 p.m.

10             MR. DEMBO:  Okay.  And then, Ms. Peel, are we able to

11     pull up 7-A at this point?

12             THE COURT:  7-A is also admitted.

13             MR. DEMBO:  Okay, thank you.  Sorry, Your Honor.

14     BY MR. DEMBO:

15     Q.  Is that a larger version of the photograph that was sent

16     out to the group message that we just saw?

17     A.  Yes.

18     Q.  And who is that in that photograph?

19     A.  Tanner Abbott.

20     Q.  Is it your impression that he took that photograph and

21     sent it out to you all?

22     A.  Yes.

23     Q.  And was there that a caption associated with this

24     photograph?

25     A.  Yes.

1        MR. DEMBO:  Okay.  Could we turn back to Government's

2    7, please, Ms. Peel, and go to page three.  Could you please

3    blow that up for us, please?

4    Q.   What did the defendant say in this text?

5    A.   Time to violate rights.

6        MR. DEMBO:  One moment, Your Honor.

7    Thank you, Your Honor.  We can take that down, Ms. Peel.

8    Q.   My much smarter co-counsel had other things I should ask

9    you, Mr. Hopper.

10   First, going back to this incident with Mr. Thomas, we

11   talked about the idea of putting someone against a wall to

12   handcuff them, do you remember those questions?

13   A.   Yeah.

14   Q.   How hard is it, especially with an individual in a

15   medical boot to push someone into the wall and hold them for a

16   handcuffing technique?  How hard do you normally have to push

17   them into the wall?

18       MR. MORGAN:  Object to form, there's been no

19   foundation.

20       THE COURT:  Overruled.

21   A.   To my knowledge and training and experience, I mean, it's

22   not very hard.  I mean, especially if you have control of one

23   of their other arms, it's not very hard.

24   Q.   Compared to that knowledge, training, and experience, how

25   hard did it appear the defendant put Mr. Thomas into the wall?

1    A.   It was pretty hard.

2    Q.   And is the technique that we're talking about when you're

3    putting someone against the wall supposed to result in their

4    head and face hitting the wall with, in your words, a thud?

5    A.   No.

6    Q.   Based on your understanding of BCSO training and policy,

7    was there a requirement that you are to report uses of force

8    when you had to do them as a law enforcement officer?

9    A.   Yes.

10   Q.   Was the throw into the wall forceful enough that you felt

11   that that requirement under BCSO training and policy applied

12   such that he would have to report that?

13   A.   Yes.

14   Q.   You also mentioned at one point that Mr. Thomas had

15   pulled away slightly while he and Mr. Abbott were arguing; is

16   that right?

17   A.   Yes.

18   Q.   Did that pull away look like an escape attempt to you?

19   A.   No.

20   Q.   Did it appear to you to be aggressive in any way?

21   A.   No.

22        MR. DEMBO:   Tender the witness, Your Honor, thank

23   you.

24        THE COURT:   Mr. Morgan, would you like to take -- I

25   assume so, take a break before we proceed with the

1    cross-examination.

2         Ladies and gentlemen, we will take our afternoon break at

3    this point, approximately 20 minutes.  Please keep in mind the

4    admonitions that you've been given previously not to discuss

5    the case among yourselves.

6         We'll call the jury back in 20 minutes.

7         (The jury left the courtroom at 2:25 p.m.)

8              THE COURT:  Thank you.  Mr. Hopper, you can step down

9    while we are in recess.  We'll resume in 20 minimums.

10        (A recess was taken at 2:27 p.m. until 2:48 p.m.)

11             THE COURT:  Thank you.  All members of the jury are

12   present, defendant and counsel are also present in the

13   courtroom.  We'll continue at this time with cross-examination

14   of the witness.

15        Mr. Hopper, you're still under oath, of course.

16        Mr. Morgan, you may proceed.

17             MR. MORGAN:  Thank you, Judge.

18                          CROSS-EXAMINATION

19   BY MR. MORGAN:

20   Q.   Sir, regarding the use of force as I understand it, the

21   general allowance is a level up; is that correct?

22   A.   Yeah, one up.

23   Q.   So if a person is being encountered with someone who is

24   resisting, a level up in force may be permitted, it doesn't

25   have to be, but it may be permitted under the policies, under

1   the training to effectuate or to do whatever that officer is

2   trying to do; correct?

3   A.   Yeah.

4   Q.   I'm sorry?

5   A.   Sorry, yes.

6   Q.   Okay.  Thank you.  I don't hear so well, so if you would,

7   please --

8   A.   I apologize.

9   Q.   Yeah, be careful with that microphone.  There are

10  policies in writing at Boyle County Sheriff's Office; right?

11  A.   On a CD disc, but yeah.

12  Q.   Oh, did you print those on the CD disc?

13  A.   We didn't.  A supervisor did, we didn't.

14  Q.   I'm just talking about you, okay.  And your supervisor

15  was Cody McCoy -- Casey McCoy; correct?

16  A.   He was one of the supervisors, yes.

17  Q.   Who else was your supervisor?

18  A.   Chris Stratton and Sheriff Robbins.

19  Q.   Right.  Sheriff Robbins was the high sheriff, Chief

20  Deputy Stratton, Casey McCoy, deputies?

21  A.   Yes.

22  Q.   Casey McCoy is now the county clerk in Boyle County;

23  right?

24  A.   Yes.

25  Q.   When you were working there with Tanner, he was your-alls

1    immediate supervisor, your boss, so to speak; right?

2    A.   Correct.

3    Q.   You had no problems with Casey McCoy; correct?

4    A.   No.

5    Q.   In fact, do you remember telling the FBI agent that Casey

6    McCoy did everything by the book.  Do you remember that?

7    A.   Yeah.

8    Q.   Is that what you recall?

9    A.   Yes.

10   Q.   Okay.  If you need time to -- if you think I'm misstating

11   something, you please let me know, okay?

12   A.   Okay.

13   Q.   Okay.  And one thing to be clear of, there is a record

14   being made here, there's a transcript that's being written up

15   and you need to answer out loud, okay?

16   A.   Okay.

17   Q.   Going back to this level up, do you agree with me that

18   probably one of the hardest things to do in trying to make an

19   arrest is trying to make an arrest of an intoxicated person or

20   someone who is under the influence of drugs, particularly

21   methamphetamine?

22   A.   Yes.

23   Q.   Methamphetamine is not something that takes someone down

24   and slows them down, is it?  It's something that makes them do

25   stuff that they wouldn't normally otherwise have in their head

HOPPER - Cross                                                          69

1    to do?

2         MR. DEMBO:  Objection, Your Honor, counsel is

3    testifying.

4         MR. MORGAN:  I'll rephrase, Judge.

5         THE COURT:  Go ahead, rephrase.

6         MR. MORGAN:  Thank you, sir.

7    BY MR. MORGAN:

8    Q.   You've seen people on meth before; right?

9    A.   Yes.

10   Q.   They do some weird stuff, don't they?

11   A.   They do.

12   Q.   You agree with me that meth is a serious problem to

13   central Kentucky, to our nation?

14   A.   Yes.

15   Q.   And another thing that makes -- or as a general group of

16   people who are hard to handcuff, in addition to someone on

17   meth or on drugs is a career criminal.  You agree with that?

18   A.   Can you rephrase that?

19   Q.   Do you agree with me that career criminals can be an

20   extremely difficult set of persons to try to handcuff?

21   A.   Yes.

22   Q.   One other thing that I want to talk -- get your

23   observations of, because you're in law enforcement now, is

24   this drug it's called Serenity.  It also goes by the name of

25   ren.  You've heard of that, haven't you?

1    A.   I have.

2    Q.   Tell the jurors what is ren?

3    A.   It's a synthetic marijuana.

4    Q.   Does it get somebody stoned like marijuana or does it

5    kind of do other things?

6    A.   I don't know what it does.

7    Q.   Okay.  Well, you've seen people who have said they have

8    been on ren, haven't you?

9    A.   I have, yes.

10   Q.   Do they seem to be like your typical stoner who smokes a

11   bunch of dope?

12   A.   I think it has affects on people differently.

13   Q.   Fair enough.  Do you agree with me that ren is a problem

14   in Kentucky?

15   A.   Potentially, yes.

16   Q.   Do you agree with me that people do drugs all different

17   kinds of ways.  They can smoke it in pipes in the form of

18   meth, they can -- and now in the last few years it's gotten

19   real popular to put it into pods and then plug those into

20   these vape machines and they can inhale -- it can be anything,

21   but THC is one thing that's frequently used in vape pods; is

22   that correct?

23   A.   Yes, sir.

24   Q.   People get every bit as stoned smoking THC vape pods as

25   they would smoking a marijuana cigarette, right, maybe more?

HOPPER - Cross                                                            71

1    A.   Yes.

2    Q.   Do you agree with that?

3    A.   Yeah.

4    Q.   When you go to make this arrest on William Welch on

5    February 2nd, what I've heard you to say is you and Tanner

6    Abbott had conducted a controlled buy in which someone,

7    probably a confidential informant, I'm guessing, went and

8    bought drugs from William Welch the same -- just within a

9    short period of time, from when you two pulled over -- pulled

10   over Mr. Welch and White; correct?

11   A.   Yes.

12   Q.   And you knew at that point in time that -- well, you knew

13   at least that Welch had sold some dope, this was meth, wasn't

14   it, that he sold?

15   A.   Yeah, we found marijuana and meth in the car.

16   Q.   You found both of them, but to the CI, to the

17   confidential informant that was -- did Welch sell meth?

18   A.   I think it was meth.

19   Q.   Yeah.  So you knew that had happened and you kind of

20   basically had watched it; right?

21   A.   Correct.

22   Q.   So you-all pull him over where this was, I think you said

23   Janes Drive or James Drive?

24   A.   Jane Trail.

25   Q.   And as I understand it, that is about what, a half mile

1   from the jail?

2   A.   Yeah, just about, I would say.

3   Q.   Short distance from where you had Mr. Welch and White

4   stopped to where Welch was eventually taken to jail; right?  A

5   fairly short distance?

6   A.   Short distance, yes.

7   Q.   He gets pulled over.  And I heard you say to the jury

8   that if Tanner had said he didn't -- if Tanner had told, I

9   think it was Welch or maybe it was his brother, Josh White,

10  Tanner didn't know what this was.  This wasn't his -- it

11  wasn't his operation, that would be correct to the part that

12  it was your operation, you were the one in charge; right?

13  A.   I wouldn't say I was the one in charge.

14  Q.   What would you say?

15  A.   I would say I was the one that initiated the traffic

16  stop.

17  Q.   Were you the one that was working this confidential

18  informant?

19  A.   I'm pretty sure I believe that Tanner was.

20  Q.   Okay.  So you were driving separate cars from Tanner;

21  right?

22  A.   I was separate, yes.

23  Q.   You pull over or you stop Welch and White, and it would

24  make sense for Tanner to say to White or Welch or whoever it

25  was, he didn't know anything about this because he didn't want

1   to say, oh, we just conducted a controlled buy and a

2   confidential informant just purchased methamphetamine from

3   William Welch.  That would be a risk to that confidential

4   informant for him to do something like that, wouldn't it?

5   A.   In that time, yes.

6   Q.   Yeah.  So the fact that when Tanner is asked, what's

7   going on, he says, I don't know.  I mean, he's helping further

8   this drug investigation and he's helping to protect a

9   confidential informant; right?

10  A.   Yes.

11  Q.   Okay.  Tanner recorded this on his phone; right?  He's

12  got an iPhone, the stop of William Welch on February 2?

13  A.   Yes.

14  Q.   He recorded that.  And you knew it at that time that he

15  was recording this; right?

16  A.   I did at that time, yes.

17  Q.   I mean, he wasn't -- he didn't have it kind of stuck in

18  his pocket with a little peep hole or something like that.  It

19  was out there kind of like a body worn camera is typically on

20  an officer whose department issues body worn cameras; right?

21  A.   Tanner always carried his phone in that same pouch.

22  Q.   Okay.

23  A.   Because the way that that vest was designed, there was

24  pouches right there so that's where he always stuck his phone.

25  Q.   Okay.  Well, you knew that he was recording that night?

1    A.   At that time, yes, I was.

2    Q.   And at that time you knew he was recording; correct?

3    A.   Yes.

4    Q.   And at that time, the Boyle County Sheriff's Office did

5    not have body worn cameras for you or Tanner or anybody else,

6    did they?

7    A.   No, sir.

8    Q.   And this is Tanner taking it on himself to record this;

9    right?

10   A.   Sure.

11   Q.   Is that a sure?

12   A.   Yes.

13   Q.   Okay.  Did you ever take your phone and use it as a body

14   worn camera?

15   A.   No.

16   Q.   Why not?

17   A.   Because I didn't have to and I didn't want to.

18   Q.   Okay.  You're at Lancaster now; right?

19   A.   Yes, sir.

20   Q.   Do you have body worn cameras there?

21   A.   We have dash cameras.

22   Q.   Dash cameras?  Okay.  And you worked at Boyle County,

23   you're working now at Lancaster, you worked before at

24   Danville, right, Danville Police Department, did they have

25   body cameras there?

1    A.   They did.

2    Q.   When you were there?

3    A.   Yes, sir.

4    Q.   Did you find that these body worn cameras in Danville

5    really kind of help because it does preserve to some extent

6    what happens?

7    A.   Yes.

8    Q.   And a lot of times when you get people -- someone who

9    comes in and is complaining about an officer and saying they

10   did something wrong, you go pull it up on the computer, see

11   what the body worn camera shows; right?

12   A.   Yes.

13   Q.   That can help an officer, can't it?

14   A.   It could.

15   Q.   Where else have you worked in law enforcement besides

16   Danville, Boyle County, and Lancaster?

17   A.   Lebanon Junction.

18   Q.   Lebanon Junction?

19   A.   That was the agency that sent me to the academy.

20   Q.   I'm sorry, I don't hear so good.

21   A.   That was the agency that sent me to the police academy.

22   Q.   Okay.  Well, didn't you work at the Fayette County

23   Sheriff's Office too?

24   A.   I did.

25   Q.   Why didn't you mention that?

1    A.   Because he was asking about patrol experience and what --

2    after I went through the Police Academy of Criminal Justice.

3    Q.   Okay.  Let's go back to February 2nd.  You pulled them

4    over.

5         MR. MORGAN:  Madam Clerk, I'm sorry, I'm going to

6    kind of use this off and on.

7    Q.   But you got the -- Tanner has got the video going, you

8    know he's got it going, you're going over to the driver's

9    side, Tanner is going to the passenger; right?

10   A.   Yes.

11   Q.   Correct?  Okay.  Is this -- do you see the screen up in

12   front of you?

13   A.   I do.

14   Q.   Okay.  And let me play this here real quick.

15        COURTROOM DEPUTY:  Is this admitted?  Is this the one

16   you've previously had?

17        MR. MORGAN:  I think this is 4, this is Government's

18   4.

19        COURTROOM DEPUTY:  Okay.  Go ahead.

20   BY MR. MORGAN:

21   Q.   Let me show you, sir -- I'm sorry, let me -- I don't want

22   to talk while you're watching.

23        (Playing video.)

24   Q.   There's a person here and I want you to tell the jurors

25   whether that's you, okay?

1    A.   Yes, that's me.

2    Q.   Okay.  Do they -- is there a no beard policy in

3    Lancaster?

4    A.   Is there a no beard policy?

5    Q.   I know some law enforcement agencies say no beards?

6    A.   Yeah, we can't have beards.

7    Q.   Okay.  But you're wearing a beard in this video; right?

8    A.   I am.

9    Q.   A nice beard.  When did you shave off your beard?

10   A.   When I started at Lancaster.

11   Q.   Okay.  Now, I think what I heard you to say is, in your

12   testimony here today, you have -- it seemed like a long time

13   that you were rolling around with William Welch in the gravel?

14   A.   I think when I initially stated that, yes, I think I did

15   say a long time.

16   Q.   Okay.  And do you remember what you said to the grand

17   jury when you testified about how long you and Mr. Welch

18   wrestled?

19   A.   I would say for a small amount of time.

20   Q.   You think you said small amount of time?

21   A.   I think I said the same thing, didn't I?

22   Q.   Well, do you remember using the phrase ten minutes?

23   A.   I do.  That's what I was saying about a long period of

24   time.

25   Q.   Is ten minutes a small amount of time or a long amount of

HOPPER - Cross                                                      78

1   time to be wrestling around with somebody?

2   A.   A long time.

3   Q.   Okay.  And you're saying now it was a small amount of

4   time; is that right?

5   A.   No, I wasn't saying that was a small amount of time, no.

6   Q.   Okay.  How long do you recall wrestling around with

7   Mr. Welch?

8   A.   What I testified earlier is I said it was probably

9   20 seconds, maybe.  I said it might have seemed longer than

10  what it was.

11  Q.   Okay.  And when you testified to the grand jury in this

12  building, and you were under oath, this was on July 5th, did

13  you tell those grand jurors three different times that it was

14  ten minutes?

15  A.   Could have.

16  Q.   Okay.  Do you think there's a difference between ten

17  minutes and 20 seconds?

18  A.   Absolutely.

19  Q.   Why would you tell the grand jurors ten minutes but

20  you're telling these jurors 20 seconds?

21  A.   Because I might have slipped my memory.

22  Q.   That's a big slip, don't you think?

23  A.   You could say so.

24  Q.   All right.  I'm going to fast forward up here to the

25  fight, okay, to the struggle.  Let me -- before I get to that

HOPPER - Cross                                              79

1    though, you've worked with Tanner for a long time, some time,

2    and Tanner is a K-9 officer and he has his dog Aja; right?

3    A.   Yes.

4    Q.   You've seen Tanner and Aja work many times; right?

5    A.   Yes.

6    Q.   Have you seen Tanner throw a red ball to get Aja to alert

7    on a particular place?

8    A.   Have I seen him throw a ball and get her to alert?

9    Q.   A red ball, not just any ball, a red one?

10   A.   No.

11        (Playing video.)

12   Q.   Okay.  You've seen this video before; right?

13   A.   Yes.

14   Q.   How many times?

15   A.   I would say it's probably about the third time I've seen

16   it.

17   Q.   When was the first time you saw it?

18   A.   First time I saw it would have been, I don't know, maybe

19   like, including today, this would have been the second time

20   I've watched it.  I've seen it about three times.  I think the

21   first time I saw it was when I met with them the third time.

22   Q.   Okay.  I think you've seen this video today.

23   A.   Yes.

24   Q.   You saw it in getting ready to testify for today?

25   A.   Correct.

1    Q.   When was that?

2    A.   That would have been last week.

3    Q.   And have you seen it another time besides those two

4    times?

5    A.   Yeah, we watched it again the other time, too.

6    Q.   When was that, about when was that?

7    A.   It would have been back in December.

8    Q.   '23?

9    A.   Yes, sir.

10   Q.   Okay.  That was the first time that you've seen it?

11   A.   Yes.

12   Q.   Okay.  In this video -- and as you've seen, as you've

13   testified and as we have seen, at some point in time, you're

14   on the driver's side, Tanner is on the passenger side, and

15   this is an SUV; right?

16   A.   Yeah, it's one of those crossover vehicles.

17   Q.   Okay.  Relatively tall vehicle, it's not some low thing;

18   right?

19   A.   Yes.

20   Q.   And as I understand it, when you're in the driver's side,

21   you're there dealing with Mr. White; correct?

22   A.   Yes.

23   Q.   Tanner is over there on the other side dealing with

24   Welch?

25   A.   Yes.

1    Q.    You knew to go to help Tanner because you could hear he

2    was having a hard time; right?

3    A.    I heard him, yeah, talking back and forth, loudly, yes.

4    Q.    Okay.  And you could tell Tanner needed help; right?

5    A.    He didn't ask for help.

6    Q.    Okay.  But you went to render help?

7    A.    I was at the back panel of the door, the D pillar of the

8    car, the back portion of the glass.  I was actually trying to

9    keep eyes on Mr. White and what was going on over there at the

10   same time, if that makes sense.

11   Q.    Well, don't ask me that.  What I'm trying to figure out

12   is what you were doing, because it seems to me you were

13   occupied with Mr. White.  You're trying to figure out what all

14   he's got going on, what, if anything, you're looking for your

15   safety.  You're keeping an eye out, your head is on a swivel,

16   you're always looking around for something, and Tanner is over

17   here dealing with Welch; right?

18   A.    Yes.

19   Q.    And you hear, I think you just said a second ago, you

20   could hear the voices between Tanner and Welch; right?

21   A.    Yes.

22   Q.    What did you hear?

23   A.    I just heard them -- basically him telling him about, I

24   guess he felt the abnormal object in his pants, and then I

25   heard William saying, you know, what are you doing?  What are

*HOPPER - Cross*                                                    82

1   you doing?  And that's when I started kind of creeping towards

2   the back of the car.

3   Q.   Where is White?

4   A.   White is with me.

5   Q.   And in cuffs?

6   A.   I think I did put him in cuffs.

7   Q.   At that point or before?

8   A.   I don't really remember.

9   Q.   Okay.  Well, putting someone in handcuffs is in this

10  force continuum, isn't it?

11  A.   You're detaining them.

12  Q.   Yeah.  What did White do that made you put him in cuffs?

13  A.   I don't remember.

14  Q.   Anyway, you hear Tanner, and did you know him to go by

15  Two, the nickname?

16  A.   I've heard the reference.

17  Q.   Okay.  Do you come right around to help him and then go

18  straight into Welch?

19  A.   Right in, no.

20  Q.   What did you do?

21  A.   I was standing there.

22  Q.   Just watching?

23  A.   For a brief time, yes.

24  Q.   Now, brief, is that 20 seconds, 10 minutes?  What is

25  brief and you're talking about now?

1    A.   I don't know.

2    Q.   Don't know.  Okay.  Good thing is, we've got us a video

3    here so let's watch it a little bit.

4         (Playing video.)

5    Q.   Is this what you're talking about with Welch raising his

6    voice and getting upset?

7    A.   At that point, no.

8    Q.   Okay.

9    A.   Because I'm still on the other side of the car.

10   Q.   How do you know you're on the other side of the car?

11   A.   I saw myself over there searching the driver.

12   Q.   So you're still on the other side of the vehicle on the

13   driver's side dealing with Mr. White, Tanner is over here on

14   the passenger side dealing with Welch?

15   A.   Yes.

16   Q.   And what we've seen here is where Tanner is searching

17   Mr. Welch and he pulls up his pants.  I mean, that's what we

18   hear, and he -- and something, Welch reacts, do you agree

19   that's what it sounds like on this?

20   A.   Sounds like, yeah.

21   Q.   Isn't it true, that Welch had this meth and his meth pipe

22   in his underwear?

23   A.   That was later found, yes.

24   Q.   Yeah.  That might be why Mr. Welch is getting a little

25   nervous about a police officer, a sheriff's deputy searching

HOPPER - Cross                                                          84

1   him and pulling up his pants; right?

2           THE COURT:  I'll sustain the objection,

3   argumentative.

4           MR. DEMBO:  Calls for speculation.

5           MR. MORGAN:  Okay.

6           THE COURT:  The record will reflect at this point

7   we're at 9:35 in the United States Exhibit 4.

8           MR. MORGAN:  Thank you, Judge.

9   BY MR. MORGAN:

10  Q.  Do you know at this point in time when we just heard

11  Tanner -- or well, we heard Tanner say, why are you so jumpy?

12  And do you know whether at that point in time Tanner had

13  grabbed Mr. Welch's groin?

14  A.  Do I know?  No.

15  Q.  Okay.  We know what we hear from Tanner where he's

16  saying, I'm just lifting up your pants; right?

17  A.  Yes.

18  Q.  And that can be something just as easy as that; right?

19  A.  Yes.

20  Q.  Okay.  At this point in time, though, I want to be clear,

21  you're over here.  Let's say this is the driver's side door,

22  you're over here with Mr. White; correct?

23  A.  Yes.

24  Q.  Okay.  You're not back here at this rear quarter panel or

25  over here at this rear passenger quarter panel, are you?

1   A.   No.

2   Q.   Okay.  Play this a little bit more.

3        (Playing video.)

4   Q.   That noise, that (indicating), what does that sound like

5   to you?

6   A.   Handcuffs.

7   Q.   What did it look like to you at that point in time on

8   Tanner's video?

9   A.   He was trying to put handcuffs on him.

10  Q.   Did it look like he did?

11  A.   One on one hand.

12  Q.   Yeah.  And it appears -- can you tell which hand?

13  A.   I can't tell if that is his left or his right.

14  Q.   Okay.  And at that point in time, where was -- what

15  happened to Mr. Welch?  What did you just see there on that

16  video?  What did Mr. Welch do when he got that -- when we

17  heard that?

18  A.   He was pulling away.

19  Q.   Pulling away.  And what was he doing towards Tanner?  He

20  was turning towards Tanner, wasn't he?

21  A.   I see him going that way.

22  Q.   Okay.  Let's look again.

23       (Playing video.)

24  Q.   Sir, under your training, even a bottle of water can be

25  used as a weapon; right?

1   A.   Anything can be potentially used as a weapon.

2   Q.   That telephone that Mr. Welch had in his hand, that's

3   something harder, really, than somebody's fist.  That can be

4   used as a weapon as well, couldn't it?

5   A.   It could be.

6   Q.   Do you remember there being a knife found on Mr. Welch,

7   that knife right before this search?

8   A.   I don't remember.

9   Q.   Okay.  So this is happening, Welch turns around,

10  confronts Abbott, got one cuff on one hand, you're still over

11  here with White; correct?

12  A.   I think at that point in the video I was making my way

13  around the backside of the vehicle.

14  Q.   And you can see that in here?

15  A.   I can't see it, but I'm just assuming so.

16  Q.   Okay.

17  A.   Because I'm pretty sure here in a little bit you'll see

18  me at the back corner of the quarter panel.

19       (Playing video.)

20  A.   There I am right there.

21       (Playing video.)

22  Q.   Was that you?

23  A.   Was that me where?

24  Q.   Okay.  There was a person back there --

25  A.   That was --

1  Q.   -- back on the passenger -- back by the car.  Do you

2  think that was you?

3  A.   The one standing right over here in between Tanner's

4  cruiser and the car, is what you're talking about in the black

5  clothing?

6  Q.   Let's watch again, because as I saw this, and you tell me

7  if I'm wrong, it looks like there's a person standing back

8  there on the rear passenger side, but a little further away

9  and it looks kind of like Josh White to me.  But you look at

10  this and you tell us who it is.

11      (Playing video.)

12  Q.   Who was that?  Did you see that person there for a split

13  second?

14  A.   Yeah, I seen him.

15  Q.   Who?

16  A.   I don't know who he is.

17  Q.   You don't know who it is?

18  A.   No.

19  Q.   You know it's not you?

20  A.   It's not me, no.

21  Q.   And there was no one else back there besides that person,

22  not you, not Mr. White, not Mr. -- is that right?  I mean,

23  there's no one else back there; correct?

24  A.   At that time, no.

25  Q.   Well, this is one of these things that they talk about

1   bang, bang things, things are happening real fast, aren't

2   they?  Aren't they?

3   A.   Yeah.

4   Q.   And that, I mean, that's part of being a police officer,

5   this is a hard job; right?

6   A.   Yeah.

7   Q.   And you have to make split second decisions, because you

8   don't know whether there's another knife nearby, do you?

9   A.   No.

10   Q.   And this guy has spun around and is looking straight at a

11   deputy, and he, as you say, pulls away.

12        Let's keep watching this and you tell us when you appear.

13        (Playing video.)

14   Q.   Okay.  You're not there for that little second or so;

15   right?

16   A.   Yes.

17   Q.   Is that correct, you were not there?

18   A.   I wasn't, yes.

19        (Playing video.)

20   Q.   Where are you?

21   A.   I'm at the back of the car.

22   Q.   Here you come, you're walking up at that point now.

23   A.   I've been standing there a little bit, short period of

24   time.

25   Q.   Okay.  Stood there and watched Tanner and Mr. Welch;

1    right?

2    A.   I did.

3    Q.   Let's watch this a little longer.

4         (Playing video.)

5    Q.   Okay.  I want to be clear, this is Tanner's perspective,

6    right?  This is Tanner with Welch right in front of him.  He's

7    trying to get this guy's other arm, his other hand around to

8    cuff him; correct?

9    A.   Yes.

10   Q.   And the vehicle -- well, we're on the passenger side over

11   here.  If this is the vehicle, the vehicle is right here, I

12   mean, he's trying to use this vehicle as what you were saying

13   a support to help gain that leverage to get that other hand

14   behind his back, and he cannot.

15        You don't think Tanner is fooling around, goofing off

16   here, do you?

17   A.   No.

18   Q.   I mean, you really believe that he was having a hard time

19   with William Welch trying to get his arm around; right?

20             MR. DEMBO:  Objection, calls for speculation.

21             THE COURT:  Mr. Dembo, I'll sustain the objection

22   based on the argumentative nature, not based on speculation.

23             MR. MORGAN:  Yes, sir.

24             THE COURT:  Objection is sustained.

25   BY MR. MORGAN:

HOPPER - Cross                                                90

1    Q.   Let's keep watching, sir.

2         (Playing video.)

3    Q.   I hear Mr. Welch saying that's what he's doing.   Tanner

4    keeps saying, put your arm around your back, put your arm

5    around your back.   And I hear Mr. Welch saying, that's what

6    I'm doing.   Did you hear that too?

7    A.   I did.

8    Q.   Did you see him putting his arm around his back and

9    complying with Tanner's requests?

10   A.   Was he putting his hand behind his back?   No.

11   Q.   Yeah.

12        (Playing video.)

13   Q.   Okay.   There was just a second there where what I saw,

14   you tell me if I'm wrong, tell the jurors if I'm wrong, where

15   it looked like maybe both of you had Mr. Welch up on that car,

16   because it looked like his, at least one foot was sort of off

17   the ground.   So that would be using this car as the support to

18   try to get him off the ground; is that right?   Do you remember

19   that?

20   A.   Me helping him and his foot coming off the ground?

21   Q.   Yes, sir.   Do you remember that?

22   A.   I don't remember that, no.

23   Q.   Okay.   Well, let's look again.

24        (Playing video.)

25   Q.   Did you hear what Tanner said there, we got a fight?

*HOPPER - Cross*                                                                 91

1    A.    We got one fighting.

2    Q.    Yeah.

3    A.    I did.

4    Q.    That's what Tanner said; right?

5    A.    Yes.

6    Q.    What's that mean to you to hear an officer saying, we got

7    one fighting?

8    A.    Put it over the radio.

9    Q.    What does that mean, put it on the radio, that we got one

10   fighting?

11   A.    For additional units.

12   Q.    Why do you call for additional units if you have someone

13   fighting a peace officer?

14   A.    I guess because you need help.

15   Q.    Officer safety?

16   A.    Could be.

17   Q.    Could be part of that help?

18   A.    Could be.

19   Q.    Are you in this struggle --

20   A.    I think so.

21   Q.    -- that we're seeing on the video here?

22   A.    I think so.

23   Q.    It's basically you and Tanner versus Mr. Welch?

24   A.    Yes, this is the part where I was saying that we were

25   attempting to go to the ground.

1   Q.   And I got to say, you look to be a pretty well developed

2   muscular person, someone who is not an easy pushover.  Were

3   you that way in 2021, were you as muscular?

4   A.   I don't know.

5   Q.   Well, I'm not asking you to be modest here, were you a

6   well developed, workout a lot?

7   A.   I worked out when I could, yeah.

8   Q.   Okay.  All right.  Let's go back to the video.

9        (Playing video.)

10   Q.   Is Tanner laughing at that point?

11   A.   He laughed.

12   Q.   I'm sorry to interrupt, could you hear laughter in

13   Tanner's voice saying, back up, back up?

14   A.   No.

15   Q.   Did he sound like he was enjoying himself?

16   A.   No.

17   Q.   Were you?

18   A.   No, definitely not.

19        (Playing video.)

20   Q.   Okay.  This is you in the hat; correct?

21   A.   Yeah, I had a toboggan on my head.

22   Q.   Because at this point you and Tanner were struggling with

23   Mr. Welch, you all three go down on the ground, continue to

24   struggle.  Tanner has gotten up, you're still down here with

25   Welch; correct?

1    A.   Yes.

2    Q.   You're on your -- well, I say you're down here, you're

3    not struggling rolling around on the gravel with Mr. Welch, it

4    looks like you're up on at least a knee, maybe squatting,

5    something like that; is that correct?

6    A.   At that point, yes.

7       (Playing video.)

8    Q.   Okay.  Looks like the struggle is over.

9    A.   So when you were talking about me rolling around on the

10   ground, there's a lot in that video, that's a lot, obviously

11   it's just a lot of rummaging and a lot of blurry.  At that

12   point I'm sitting on top of him.  I'm not going to be laying

13   across his face when I'm on top of him, that's a complete

14   risk.  So I put myself upright.  When you saw -- right there

15   where you said I wasn't rolling around in the gravel, I was

16   just trying to make that point.

17   Q.   Okay.  Well, but the point is --

18   A.   I finally got him rolled over, is what I was trying to

19   explain.

20   Q.   Okay.  All right.  Let's finish this part out.

21      (Playing video.)

22   Q.   Okay.  The struggle is pretty much over at that point;

23   right?

24   A.   Yes.

25   Q.   Do you remember talking with the FBI agent in July of

1    2023 about this, what we've seen here so far, about this

2    incident and struggle.  Do you remember talking with the, I

3    think it was this agent here?

4    A.   Yes.

5    Q.   Agent Holliday.  Do you recall telling her that Tanner

6    did an aggressive search on Welch's groin which caused Welch

7    to jump; do you remember saying that?

8    A.   Yeah.

9    Q.   In this video that we saw, did you ever see Welch jump?

10   A.   I think there was a point where he turned around and was

11   asking what he was doing, because I think it was in the video,

12   what are you doing?  What are you doing?

13   Q.   That Welch turned around and said, what are you doing?

14   What are you doing?

15   A.   Yes.

16   Q.   Okay.  And could you see Welch when he turned around and

17   said, what are you doing?  What are you doing?

18   A.   Yeah.

19   Q.   Yes, you could?

20   A.   You could.

21   Q.   And what you said to the agent in July of '23 is that's

22   when Tanner punched Welch.  Did you see that on the video?

23   A.   Huh-uh.

24   Q.   That's a no, you did not see it?

25   A.   I apologize, no.

1    Q.   And then, in the statement to the agent, you said that

2    Welch became angry at that and then, quote, rolled around with

3    you.  Do you remember saying that?

4    A.   Yes.

5    Q.   And you told the agent that while you and Welch were

6    rolling around on the -- in the road, Tanner stood up and

7    laughed.  Do you remember saying that?

8    A.   I do.

9    Q.   There's no laughter in this video, is there?

10    A.   No.

11    Q.   Why did you tell this agent in July of 2023 that Tanner

12    was laughing?

13    A.   Because my memory slipped, and then once I saw the video,

14    obviously, I mean, that changed and I see that now.

15    Q.   Well, laughter is quite a thing to remember in an event

16    like this; correct?

17    A.   It could be.

18    Q.   Well, what does that sound like if someone is laughing

19    while two people are struggling?  What does that sound like to

20    you about the laugher, the person laughing?

21    A.   That they think it's funny.

22    Q.   What does that say about them if they think it's funny

23    for you and Welch to be rolling around?

24    A.   I don't know how to answer that question.

25    Q.   Okay.  Do you remember being warned at that time that

1    lying to the FBI could be an offense?

2    A.   I do.

3    Q.   But yet you told them about this laughter, and now you've

4    seen this video, and you recall this, your memory slipped?

5    A.   Yes.

6    Q.   Well, you talked to the agent on, I think it was the 5th

7    of July and 6th of July of 2023, you went and testified in

8    this courthouse in the grand jury; do you remember that?

9    A.   Yes.

10   Q.   Do you remember telling the grand jurors that Tanner was

11   searching Welch, Welch jumped and turned around and that's

12   when Tanner hit Welch in the face?

13   A.   That was my knowledge at that time, yes.

14   Q.   Has that changed?

15   A.   Yeah, when I saw the video, yes.

16   Q.   I mean, you're under oath before the grand jury, do you

17   remember it was the same oath that this -- that the Judge,

18   that the clerk, that these jurors have heard you swear to

19   today?

20   A.   I do.

21   Q.   Do you remember telling the grand jurors that Welch was

22   quote, pretty hysterical, end quote, and said that Tanner

23   grabbed his dick -- excuse me, Tanner grabbed his dick and

24   balls area.  Do you remember telling them that?

25   A.   I do.

1    Q.    How do you know that?

2    A.    Because that's how he always searched.

3    Q.    Well, I thought I understood you to say in your direct

4    the search that you saw was normal, but now you're saying

5    that's the way he always searched?

6    A.    I said the search was normal for patting down for weapons

7    or like the initial search.

8    Q.    Let me ask you this way.  Let me go back to this thing,

9    because you told these grand jurors Tanner was laughing while

10   you and Welch were rolling around and this was where you said

11   three times that you were rolling around for ten minutes, told

12   the grand jurors that.  Did you need to see the video to get

13   that recollection refreshed?

14   A.    I don't know.

15   Q.    Well, you need to know because you're here testifying

16   against Tanner and you're saying stuff that is -- that is

17   being used against him.  So let's make sure you know what

18   you're saying here.  When you testified --

19            MR. DEMBO:  Argumentative, Your Honor.

20            MR. MORGAN:   Okay.

21            THE COURT:  Sustained.

22   BY MR. MORGAN:

23   Q.    When you testified to this grand jury, you knew you were

24   supposed to be telling the truth; right?

25   A.    Yes.

HOPPER - Cross                                                    98

1    Q.   And to this grand jury, you told them that Tanner stood

2    there and laughed.  In fact, you said Tanner was laughing and

3    backpedaling.  Did you see anything like that on this video?

4    A.   The video, no.

5    Q.   How does backpedaling get thrown into your testimony to

6    the grand jury?

7    A.   That was what I thought my memory was at that time.

8    Q.   Thank heavens for this video, because without this, it

9    would be your word against Tanner's?

10                MR. DEMBO:  Objection, Your Honor.

11   Q.   You and Mr. Welch; correct?

12                THE COURT:  This is not closing argument, Mr. Morgan,

13   so I'm going to sustain the objection.  I'll admonish you not

14   to argue the case to the jury at this point.

15                MR. MORGAN:  It's hard, Judge, but --

16                THE COURT:  Oh, come up here, it's not that hard.

17   Come up here.

18        (Sidebar conference.)

19                THE COURT:  It is not that hard when the Court

20   sustains an objection for you to stop arguing to the jury.

21                MR. MORGAN:  Yes, sir.

22                THE COURT:  Now, are you ready to take over this

23   examination, Mr. Guarnieri?

24                MR. GUARNIERI:  Judge, that would be a difficult --

25                THE COURT:  It really would be difficult, it's going

1    to happen if he does it again.  Be ready.

2         (Conclusion of sidebar.)

3              THE COURT:  And this is not a grinning matter either,

4    understood?

5              MR. MORGAN:  Yes, sir.

6         May I proceed, Judge?

7              THE COURT:  Yes.

8    BY MR. MORGAN:

9    Q.   Sir, do you remember telling the grand jury that you came

10   around this the corner of this vehicle and you basically run

11   into Mr. Welch being upset about something that Tanner did?

12   A.   Yes.

13   Q.   And then you say to the grand jury, so for the next,

14   like, ten minutes I'm running around in loose gravel with

15   William Welch trying to get his hands behind his back;

16   correct?

17   A.   I do.

18   Q.   Now, do you remember another interview with the FBI agent

19   in December of 2023 and this video was shown to you; correct?

20   A.   Yes.

21   Q.   After being shown this video, you told the FBI and the

22   Department of Justice in 2023, you thought some of your memory

23   from that night was slightly out of order regarding Mr. Welch;

24   is that correct?

25   A.   Yes.

1    Q.   Before we leave the video, sir, I want to play a couple

2    little discussions that you had.

3         (Playing video.)

4    Q.   Do you see the individual, it's blurry here, you're in

5    the screen here now; is that correct?

6    A.   Yes.

7         (Playing video.)

8    Q.   I'm sorry to interrupt, but I just want to make sure that

9    we're all focused as to what this is.  This is after Welch has

10   been arrested and he's been put in your vehicle; right?

11   A.   Yes.

12   Q.   Tanner put him in your vehicle; correct?

13   A.   I don't remember who put him in the vehicle.

14   Q.   Okay.  But no doubt, you drove Mr. Welch to jail?

15   A.   I did.

16   Q.   And if anyone said anything different, they would be

17   mistaken; is that right?

18   A.   Yeah.

19        (Playing video.)

20   Q.   Do you remember or did you hear in this video or do you

21   remember saying to Tanner, when I first walked up, he thought

22   I was you again?

23   A.   Yeah.

24   Q.   Why did you say that?

25   A.   I guess when I walked up, he was mad and thought I was

1   Tanner, so I guess things started getting escalated again is

2   probably why I said that.

3   Q.   Isn't it true that you and Tanner frequently got confused

4   by people?

5   A.   It's happened a couple times.

6   Q.   Okay.  I'm going to go forward here a few minutes.  So

7   this is, as I understand it, where the search of the vehicle

8   has ended and you all are kind of wrapping up and you're

9   trying to figure out, you know, what's going to happen, talk

10  about taking Welch into the jail and all that sort of stuff,

11  okay?  Do you remember that?

12  A.   Yes.

13       (Playing video.)

14  Q.   As I understand it, Mr. Welch had been charged with

15  several things, and when I heard your testimony earlier, you

16  were shown the citation; do you remember that?

17  A.   Yes.

18  Q.   That is the narrative.  The words that were put into the

19  charge, and do you agree with me, that based on what's written

20  in that citation in that charge, the use of force is

21  appropriate?

22  A.   What I wrote in the narrative?

23  Q.   Yes, sir.

24  A.   Appropriate to -- what do you mean?

25  Q.   A use of force, a closed fist?

*HOPPER - Cross*                                                              102

1    A.   I don't know what you want me to say, I don't.

2    Q.   Well, I'm asking -- I know you disagree that these things

3    occurred, but if they did occur, that would justify the use of

4    force that Tanner applied?

5    A.   Yes.

6    Q.   You've been asked several times about not having the

7    video, Tanner's video, but I understand you to say a few

8    minutes ago, you knew he was recording at that time, you just

9    forgot about it?

10   A.   Yes.

11   Q.   Correct?  And you never asked for Tanner's video, did

12   you?

13   A.   It wasn't my phone.

14   Q.   Well, if it was your -- what does that mean, why

15   didn't -- does that mean you didn't ask because it wasn't your

16   phone?

17   A.   I didn't know it was my job to ask.

18   Q.   Well, it's your case, right?  Your name is going on the

19   report?

20   A.   He was the one that hit the button to record it, I

21   didn't.  That was his doing the recorded phone.

22   Q.   What did you do to verify what was in that recording when

23   you were writing up this report?

24   A.   I didn't verify anything on the phone.

25   Q.   Why not?

1    A.   Because I didn't know how to.  I didn't know to do that.

2    Q.   Well, you could have just said, hey, Tanner, let's watch

3    the video from your phone; right?

4    A.   Could have.

5    Q.   But you didn't?

6    A.   I didn't, no.

7    Q.   You were asked something about, this video wasn't put

8    into evidence, why not?  It's your case, you could have put it

9    into evidence, you could have asked Tanner, let's put that

10    thing into evidence; correct?

11    A.   Could have.

12    Q.   But you didn't?

13    A.   I didn't.

14    Q.   What do you understand the charge of resisting arrest to

15    require?

16    A.   I mean, like, just being actively resistant.

17    Q.   No, I mean, under the law, what's your understanding?  If

18    you are confronted with someone and, you know, in your job,

19    and you want to charge them with resisting, what are the

20    things that you go through to make sure --

21    A.   When you're trying to place somebody under arrest and

22    then handcuffs and they actively fight you.

23    Q.   Okay.  Are you aware the law says using or threaten to

24    use physical force or violence against a peace officer?

25    A.   Yes.

HOPPER - Cross                                                    104

1    Q.   While doing an arrest?

2    A.   Yes.

3    Q.   What is your understanding of what is required for the

4    charge of menacing?

5    A.   Aggressively getting in my face.

6    Q.   Does that sound the same as a person is guilty of

7    menacing when he intentionally places another person in

8    reasonable apprehension of imminent physical injury?

9    A.   That sounds right.

10   Q.   Did you hear Mr. Welch say anything about a sworn oath,

11   solemn promise, to get back at Tanner Abbott?

12   A.   I didn't hear that, no.

13   Q.   What's your understanding of what's required for

14   terroristic threatening in the third degree?

15   A.   Third degree?  I guess to inflict danger on somebody.

16   Q.   To do what to somebody?

17   A.   My voice cracked, I apologize.  To inflict physical harm.

18   Q.   Well, that would be an assault, wouldn't it?

19   A.   I don't know.

20   Q.   Is it your understanding that under the law, terroristic

21   threatening of the third degree is when a person threatens to

22   commit any crime likely to result in death or serious physical

23   injury to another, or likely to result in substantial property

24   damage to another, or intentionally make false statements for

25   the purpose of causing evacuation of a building.  Did you know

1    that, that's what terroristic threatening in the third degree

2    is?

3    A.   Yes.

4    Q.   I'm sorry?

5    A.   Yes.

6    Q.   Because I understood you to say that you felt that the

7    terroristic threatening third, the menacing and the resisting

8    were all trumped up charges, baseless charges?

9    A.   What I thought, yes.

10   Q.   Okay.  Having heard those elements under state law for

11   those offenses, does that change anything for you?

12   A.   I don't know.

13   Q.   As I understand it, when you first met with the FBI, and

14   what I heard you say to us earlier today is you just didn't

15   remember to bring up these charges when you first met with

16   them, the charges related to William Welch?

17   A.   Correct.

18   Q.   That's just something that slipped your mind?

19   A.   Yes.

20   Q.   You first met with the FBI on September 23rd of 2021;

21   correct?

22   A.   Yes.

23   Q.   Do you agree with me, your memory would be probably

24   fresher in September of 2021 about events in February of 2021

25   than they are now; correct?

1  A.   I don't know.

2  Q.   Turn your attention to Brent Thomas.  Do you remember

3  talking to the FBI, September 23rd of 2021, and telling the

4  agent that you talked with the manager.  Is that Mr. Patel?

5  A.   I don't remember his name.

6  Q.   Okay.  But you talked with somebody named Patel who

7  agreed that Thomas needed to leave if he was selling drugs,

8  but he would not give a key.  Do you remember that?

9  A.   Yes.

10  Q.   Okay.  But I thought I heard you to say today that Tanner

11  went to the manager, person on duty, and got a key?

12  A.   Yeah, I stated that me and him both went up there.

13  Q.   Okay.  But in September of 2021, I thought I heard you to

14  say you talked with the agent and you told her that you went

15  to Patel and he said, then he shouldn't be here, but I'm not

16  giving you a key.

17  A.   I remember that.

18  Q.   You remember what?

19  A.   Me saying that.

20  Q.   Well, which is right, sir?  Don't you agree with me,

21  those are different things?

22  A.   That's what I'm trying to explain to you.  My memory

23  slipped and I guess I don't know.

24  Q.   Well, which memory is correct?  The one you had in

25  September of 2021 or the one in --

1    A.   The most recent.

2    Q.   I'm sorry, go ahead.

3    A.   The most recent.

4    Q.   Why is the most recent correct?

5    A.   Because it slipped at the time and then I just remembered

6    I guess.

7    Q.   Okay.  Well, sir, I understand what slipping is, but here

8    you're saying that you did not get a key.  You did not get a

9    key.  And now you're saying you did get a key.  Do you agree

10   with me, that's not -- that's kind of a big slippage.

11        I mean those are different.  Do you agree with that?

12   A.   Yeah.

13   Q.   So which is it?

14   A.   You're stating that the first time I was talking to them

15   you stated that I didn't get the key.

16   Q.   That's what you said, sir.

17   A.   Yes, correct, and then later on I remembered that he did

18   get the key.  And I stated that the most recent would have

19   been what it was.

20   Q.   Okay.  Well, going back to September 2021, and this is

21   what, seven months after, approximately a little more than

22   seven months after this incident -- I'm sorry.  We're talking

23   about April of 2021 with Brent Thomas; correct?

24   A.   Yes.

25   Q.   So September to April is only five months, so this is

1  approximately five months after this incident with Brent

2  Thomas you're talking with the FBI?

3  A.   Yes.

4  Q.   Correct?  And what I hear you saying now, you tell me if

5  I'm wrong, but what you told them is that the manager did not

6  give you a key, but you're wrong about that, he did give you a

7  key?

8  A.   Yes.

9  Q.   And what you told the agent was that Tanner knocked on

10  the door and entered the room without permission?

11  A.   Yeah, slid the key in the door and the door opened, and

12  the door hit a latch, correct.

13  Q.   Okay.  Well, if you slide the key or use the key, that is

14  you don't need to knock, right?  You just go in.  I mean,

15  hearing what you're saying, Tanner didn't knock, did he?

16  A.   Did I stated he knocked, he knocked.

17  Q.   Oh, he did knock?  Okay.  In December of 2022, you talked

18  again with the FBI.  I'm sorry, let me stay in September of

19  2021 here real quick because what I understood you to say,

20  what your statement to the FBI was that when Tanner went in,

21  he put Thomas under arrest, but before that he threw Thomas

22  against the wall, and then handcuffed him ; is that correct?

23  A.   Yes.

24  Q.   That's what you remember then?

25  A.   Uh-huh.

1   Q.   Okay.  Do you remember there being no mention of going

2   into a hallway or a breezeway at this Quality Inn in September

3   of 2021?

4   A.   There's no mention?

5   Q.   Correct.

6   A.   When?

7   Q.   You didn't say anything about going into a hallway in

8   September of 2021?

9   A.   Okay.

10  Q.   But you are now?

11  A.   Correct.  That would have been where he pulled him out

12  the door into a breezeway.

13  Q.   Okay.  Well, you go back and talk with the agents again

14  and others from the Department of Justice on December of 2022,

15  so this is now approximately 15 months after, so we're in

16  December of 2022, and at that time you say that Tanner got a

17  key card for Thomas's room and entered without permission.  Do

18  you remember that?

19  A.   Yes.

20  Q.   Okay.  And that's along the lines of what you're saying

21  now; correct?

22  A.   Yes.

23  Q.   And there was a woman named -- there was a woman in there

24  named Carla Gray.  Do you know Carla Gray?

25  A.   I don't, never met her before.

1    Q.   And at that time, you said that Thomas was arrested

2    with -- I'm sorry, Thomas was arrested without resistance, but

3    thrown into a wall.  Do you remember that?

4    A.   Yes.

5    Q.   Okay.  My guess is that the Quality Inn has, I would say

6    thin walls, it's not block, concrete block walls like in this

7    courtroom; correct?

8    A.   I don't know.

9    Q.   Okay.  Well, you've been in there, did you notice -- can

10   you say from experience and being in other hotels, that the

11   drywall in a Quality Inn is thin?

12   A.   I wasn't paying attention to the architecture of the

13   hotel, no.

14   Q.   Okay.  Well, my point in this, sir, is you're saying that

15   Mr. Thomas was thrown into a wall, and I heard you say today

16   that he was spun into a wall.  Would you expect to find a dent

17   or some kind of indentation in a wall?

18   A.   I don't know.

19   Q.   How about if someone has got, you know, some boot or

20   something on, you know, a plastic, one of these boots that

21   someone wears if their ankle is bothering them or whatever,

22   would that hard plastic leave a dent in the wall, do you

23   think?

24   A.   It could have, but I didn't see that.

25   Q.   Okay.  No pictures were taken; right?

1    A.   No.

2    Q.   And then in the grand jury regarding Brent Thomas, you

3    say that Tanner knocks on the door and eventually Brent Thomas

4    opens the door and the chain is there?

5    A.   Yes.

6    Q.   And you go on to say that you don't really remember who

7    opened the door latch?

8    A.   I do remember saying that, yes.

9    Q.   Who opened the door latch?

10    A.   The confusion was, you know, when the key slid in, it

11    opened the door and hit the latch, the door came back closed

12    and eventually, you know, when the door comes closed, you have

13    to unlock the latch to pull the door open.  So that's where I

14    got confused in saying, I don't know who initially, physically

15    opened the door.

16    Q.   Okay.  Do you remember saying that you were standing back

17    to the side while Tanner was right in front of the door?

18    A.   Yes, I was back behind.

19    Q.   And that Tanner pulled Brent Thomas out into the hallway,

20    and as you told the grand jurors, you're not sure how the door

21    opened?

22    A.   I wasn't.

23    Q.   Because you're off to the side, is that why you're not

24    sure how the door opened?

25    A.   I'm not going to say it was my positioning, I don't know,

1   like I said, the confusion was of who physically, you know,

2   pulled or pushed the door.

3   Q.   Okay.

4   A.   Because of the chain latch.

5   Q.   And in front of the grand jury you told them that Brent

6   Thomas had had box cutters -- box cutters on him.  Do you

7   remember that?

8   A.   I found a box cutter, yes.

9   Q.   Like what?

10   A.   I don't remember the size, I just remember I found a box

11   cutter on him.

12   Q.   And a box cutter is essentially a knife; right?

13   A.   It's a blade, yes.

14   Q.   It's a sharp thing that you use to open a box or

15   something else; right?

16   A.   Yes.

17   Q.   Like a knife.  Sir, do you agree with me, based on your

18   training and experience, that if a crime is being committed in

19   front of a peace officer, they can arrest that person for

20   committing a crime right there?

21   A.   What are you referring to?

22   Q.   Well, let's say that there is someone is committing some

23   kind of crime right in front of them, I'm not talking about a

24   probable cause felony stop or something like that, but if

25   someone is committing a crime, and let's say it's a

1   shoplifting at Walmart, okay?  The peace officer is there, and

2   they see someone grab something off the shelf and go out the

3   door.  That's committing a theft by unlawful taking; right?

4   A.   Shoplifting, yes.

5   Q.   And they can arrest that person right there because it's

6   being committed in front of them?

7   A.   Yes.

8   Q.   Correct?

9   A.   Yes.

10  Q.   Do you agree with me, sir, that getting consent, even if

11  you have probable cause, even if you've got plain sight or

12  exigent circumstances or a crime being committed in front of

13  an officer or whatever, getting consent is still a good idea.

14  Trying to obtain consent because that's just one more level,

15  one more option to make that search legal?

16  A.   Yes.

17  Q.   Now, on in January of 2021, so we're going back in time

18  here, and we're talking -- I'm talking about Ballard and

19  Newman, okay?  This is the stop, this is on the bypass around

20  Danville; correct?

21  A.   It was on Houstonville Road.

22  Q.   I'm sorry, Houstonville Road?

23  A.   Sorry, sir, yes, sir.

24  Q.   Houstonville Road?

25  A.   Yes, sir.

1    Q.   That's near the bypass; correct?

2    A.   It is near the bypass.

3    Q.   I'm sorry, what?

4    A.   It is near the bypass.

5    Q.   Okay.  And in fact, Houstonville Road as I understand it,

6    intersects with the bypass?

7    A.   Yes.

8    Q.   Okay.  So where this happened was near the intersection

9    of U.S. 150, the bypass and Houstonville Road; correct?

10   A.   Yes.

11   Q.   And when you got there, you saw a vehicle in the ditch

12   and you saw two young men there, Tanner and other officers;

13   correct?

14   A.   Yes.

15   Q.   Do you know a dispatcher named Jocelyn Obelisk?

16   A.   I do.

17   Q.   She works for Danville and Boyle County dispatch;

18   correct?

19   A.   Yes.

20   Q.   When you were testifying a few minutes ago, you said you

21   never heard a call out on this, on the radio, but you did hear

22   eventually Tanner calling saying, we got one fighting;

23   correct?

24   A.   I don't remember that.

25   Q.   Okay.  And these text messages we've seen a lot about,

1    you're in a lot of text messages, you've sent a bunch of text

2    messages as well as receive them; correct?

3    A.   Yes.

4    Q.   Fair to say that there in some of these text is a lot of

5    sarcasm?

6    A.   Yeah.

7    Q.   Fair to say that some people are saying things to

8    coworkers, to fellow police officers to something of a

9    receptive audience.

10   A.   Sure.

11   Q.   Yes?

12   A.   Sure.

13   Q.   Okay.  The text message that we saw about the one who

14   tried -- the one who says he doesn't do drugs and who I

15   supposedly hit, and then there's a picture of that vape pen

16   and two THC pods, did that strike you as being a sarcastic

17   statement by Tanner?

18   A.   I guess, yeah, you could say that.

19   Q.   And then this other text message where Tanner is wearing

20   these glasses, it's on -- well, it's on April 15th, that's tax

21   day, isn't it?

22   A.   I have no clue.

23   Q.   Well, and this is the text message that he sent out that

24   says something like, time to violate civil rights, or

25   something.  Do you remember that text?

*HOPPER - Cross*                                                        116

1    A.   Yes.

2    Q.   And that picture?  Do you agree with me, he's being

3    sarcastic in that?

4    A.   Being sarcastic?

5    Q.   Yes.

6    A.   Could have been, I don't know.

7    Q.   Well, when did -- this text message is dated April 15th,

8    do you remember getting it?

9    A.   I think I remember seeing it, yes.

10   Q.   Okay.  There are no supervisors in that text chain.  Did

11   you report this to Casey McCoy or any supervisor?

12   A.   I don't think I did, I think somebody else did.

13   Q.   Somebody else did?

14   A.   I think so.

15   Q.   Not you?

16   A.   It wasn't me, no.

17   Q.   Why not you?

18   A.   I don't know, I just didn't.

19   Q.   Okay.  Well, did you know it was a joke?

20   A.   I don't know.  He sent it, I don't know if it was a joke

21   or not, I don't remember asking him.

22   Q.   Okay.  Sir, by April 15th of 2021, you've had your

23   falling out, you don't want anything more to do with Tanner;

24   right?

25   A.   Correct.

1  Q.   And you told the jury here that you-all had some kind of

2  a meeting in the evidence room at the Boyle County Sheriff's

3  Office; right?

4  A.   Yeah, he came in the evidence -- he came in the evidence

5  room when I was standing there, yes.

6  Q.   Okay.  And about when was that?

7  A.   All I remember is that we were doing some type of use of

8  force training, the Milo training, I don't remember the

9  specific date.

10  Q.   The spring time?

11  A.   I remember it was cold out.

12  Q.   Okay.  But the year was 2021?

13  A.   Yes.

14  Q.   And you told us about Brent Thomas and you had been --

15  you were fed up with Tanner, and that's when you decided you

16  were going to distance yourself.  So did this meeting with

17  Tanner in the evidence room come after Brent Thomas?

18  A.   I think it did, yes.

19  Q.   Okay.  You told the jurors here today that you talked,

20  you and Tanner, in the evidence room, talked for a little bit

21  and that was the end of it?

22  A.   It was.

23  Q.   And that's it, is that what you're saying to these jurors

24  right now?

25  A.   Yeah.

1    Q.   What did you tell to the grand jurors?

2    A.   The grand jurors?

3    Q.   Um-hmm.

4    A.   I stated that -- are you talking about when I moved his

5    head up, is that what you're referring to?

6    Q.   I'm talking about when you told the grand jurors that you

7    punched Tanner?

8    A.   I didn't tell them that I punched him.

9    Q.   Okay.  Well, tell them what you recall saying to them?

10   A.   I advised that when he was looking down I moved his chin

11   up and told him to talk.

12   Q.   You told the grand jurors that while Tanner had his head

13   down you moved his chin up?

14   A.   Yes.

15   Q.   And how did you move up his chin?

16   A.   With my hand.

17   Q.   How was your hand?  What kind of condition was your hand

18   in when you did that?

19   A.   What kind of condition was my hand in?

20   Q.   Yeah, did you have a fist, sir?

21   A.   I'll demonstrate it to you if you want me to, it was like

22   this.

23   Q.   Okay.  So you -- I'm sorry, are you ready?

24   A.   Yes, sir.

25   Q.   As I saw what you were doing there, you demonstrated that

1     you used your hand, an open hand and the back of your open

2     hand to lift up Tanner's chin?

3     A.    Yes.

4     Q.    And what did you say when you lifted up his chin?

5     A.    I don't really remember to be honest with you.  I'd say

6     the reason why I did it was to tell him, you know, to don't

7     look down, talk to me.

8     Q.    Okay.  Do you remember with the grand juror and with

9     these lawyers being there, where you were describing this, you

10    said, I pushed his chin up like that.

11          And the question is, for the record, you're balling your

12    right hand into a fist and placing it under your own chin, and

13    you said, yes.  And then the question, Did you punch him in

14    the face?  Answer, I mean, you could say that was a punch.

15              MR. DEMBO:  Your Honor, at this point I would object

16    for foundation for impeachment.

17              THE COURT:  Sustained.

18    BY MR. MORGAN:

19    Q.    Okay.  Is a balled fist that you described here the same

20    as this raised?

21    A.    I guess when I did this, I did that, I guess I wasn't

22    thinking when I said I did it.

23    Q.    Well, sir, you understand that you're saying -- well,

24    okay.  What is your understanding of what being an unindicted

25    co-conspirator is?

1   A.   I don't know what you mean.

2   Q.   Do you know that you're an unindicted co-conspirator in

3   this case?

4   A.   Yes.

5   Q.   What is your understanding of that?

6   A.   I don't know how to answer that.

7   Q.   Well, are you under the impression that you could be

8   charged with crimes?

9   A.   I am.

10  Q.   But you're not charged with crimes; correct?

11  A.   That I know of, no.

12  Q.   You don't know whether you are?

13  A.   No.

14  Q.   Okay.  Well, you never said anything about any of this to

15  any supervisor or anyone else until September 2021 when the

16  FBI came to talk to you; correct?

17  A.   That's not true.

18  Q.   When did you say something to somebody?

19  A.   I don't remember the specific dates, but I told my

20  captain and I told the sheriff.

21  Q.   Which captain?

22  A.   It would have been the only captain at this time, I

23  believe it was Casey McCoy.

24  Q.   You told Casey McCoy that Tanner Abbott was what?

25  A.   I just told him about some things that had happened.  I

1   don't remember the specific, like, incidents or what it was.

2   I just told him about it and told him that was -- if you want

3   to talk about dates, the dates that I did, when I talked to my

4   supervisors, that's when I got put on another rotation, that's

5   when I get put on day shift.

6   Q.   Okay.  So that's going to be in April thereabouts?

7   A.   Sir, I don't remember the dates.  I don't remember the

8   dates.

9   Q.   But you're certain you talked to Casey McCoy?

10  A.   Yes.

11  Q.   And you told him that you had concerns about Tanner being

12  a bad cop?

13  A.   I just told him I didn't want to be around him anymore.

14  Q.   You didn't tell him about having concerns about him being

15  a bad cop?

16  A.   Yeah, I might have touched on that, yes.

17  Q.   That would be the important thing -- okay.

18          MR. MORGAN:  Excuse me, Judge.

19  BY MR. MORGAN:

20  Q.   One thing I forgot to mention, sir, in that video that we

21  saw with William Welch, do you remember saying at the very end

22  of that video while you-all are talking about charges and

23  things like that, saying that you thought you broke your Fing

24  hand?

25  A.   I don't remember hearing that, no.  I'm not saying I

1    didn't say that, I'm saying I don't remember saying it.

2          MR. MORGAN:  Okay.  That's all I have, thank you.

3          THE COURT:  Thank you.  Any redirect?

4          MR. DEMBO:  Yes, Your Honor, thank you.

5                    REDIRECT EXAMINATION

6    BY MR. DEMBO:

7    Q.   Mr. Hopper, on cross-examination you were asked a long

8    series of questions about an interview you gave to the FBI in

9    September of 2021.  Do you recall those questions?

10   A.   I do.

11   Q.   Specifically you were asked many times about whether or

12   not you told the FBI that the manager had refused to give you

13   and the defendant a key; right?

14   A.   Yes, sir.

15   Q.   Sitting here today, do you have an exact recollection of

16   what you told the FBI back in September of 2021?

17   A.   No.

18   Q.   Would it help your memory to read the FBI agent's 302 of

19   what you told the FBI in September of 2021?

20   A.   Yeah.

21   Q.   Okay.

22          MR. DEMBO:  May I approach, Your Honor?

23          THE COURT:  Yes, sir.  This is for purposes of

24   refreshing recollection?

25          MR. DEMBO:  It is, Your Honor.

1    THE COURT:  It may be shown to the witness.

2    BY MR. DEMBO:

3    Q.  So I'm going to hand you the 302, I'm going to ask you to

4    read the last paragraph of the first page over to the second

5    page to yourself and not out loud, and when you're done, just

6    look up and I'll get it from you.

7    A.  Okay.

8         MR. DEMBO:  May I approach, Your Honor?

9         THE COURT:  Yes, sir.

10        MR. DEMBO:  Thank you.

11   BY MR. DEMBO:

12   Q.  Did reviewing that 302 refresh your recollection as to

13   what you told the FBI in September of 2021?

14   A.  Yes.

15   Q.  And contrary to what defense was suggesting, did you ever

16   say anything about the manager refusing to give you a key or

17   giving you a key to the FBI?

18   A.  No.

19   Q.  You were asked a series of questions involving the stop

20   on Mr. Welch.  For example, you were asked some questions

21   about whether things like a water bottle could be a weapon;

22   right?

23   A.  Yes.

24   Q.  Do you remember being asked if a cell phone could be used

25   as a weapon?

1   A.   No.

2   Q.   Did you ever see Mr. Welch use his cell phone as a weapon

3   on scene?

4   A.   No.

5   Q.   Did the defendant ever say anything suggesting Mr. Welch

6   was using a weapon on that scene?

7   A.   No.

8   Q.   In that same vain, you were asked about a box cutter you

9   discovered on Mr. Thomas.  Do you recall those questions?

10  A.   I do.

11  Q.   Once again, did you ever see Mr. Thomas attempting to use

12  the box cutter as a weapon?

13  A.   No.

14  Q.   Furthermore, at the time that the defendant threw

15  Mr. Thomas into the wall, where was the box cutter in that

16  moment?

17  A.   In the hallway.

18  Q.   Was it within arms reach of Mr. Thomas?

19  A.   No.

20  Q.   Did you see him ever try to go for it?

21  A.   No.

22  Q.   And did the defendant ever suggest that Mr. Thomas was

23  using the box cutter as a weapon?

24  A.   No.

25  Q.   You were asked some questions about split second

1    decisions in law enforcement.  Do you recall those questions?

2    A.  I do.

3    Q.  Let me ask when you went and saw what the defendant was

4    doing to Mr. Welch, was there any danger in that moment to

5    officer safety that you thought required a split second

6    decision?

7    A.  Did I?  No.

8    Q.  Similarly, in the moment before you saw the defendant

9    throw Mr. Thomas into the wall, did you observe any danger to

10   officer safety that you would characterize as a split second

11   decision?

12   A.  No.

13   Q.  You were asked a series of questions about the narrative

14   you wrote up regarding Mr. Welch.  Do you recall that?

15   A.  Yes.

16   Q.  And defense specifically asked that if the events had

17   occurred the way that you had written them in the narrative,

18   that would have been a legitimate use of force under your

19   training.  Do you recall that series of questioning?

20   A.  Yes.

21   Q.  Now, you know that what you wrote in the narrative wasn't

22   the way it happened; right?

23   A.  Yes.

24   Q.  But you wrote it the way it did because you wanted it to

25   appear justified; right?

1    A.   Right.

2    Q.   What was your understanding of the entire purpose of the

3    discussion that the defendant had with you about what to write

4    in the narrative?

5    A.   Can you like rephrase that, please?

6    Q.   Sure.  Was your understanding of the defendant's

7    conversation with you, that you were -- he was telling you

8    truthful things to write in the narrative?

9    A.   No.

10   Q.   What was your understanding of the purpose of him

11   suggesting things such as Welch making an aggressive

12   advancement when you knew that hadn't happened?

13   A.   To make it seem like it was a justified use of force.

14   Q.   You were also asked a series of questions about why you

15   didn't go and pull the cell phone camera.  Do you recall that?

16   A.   Yes.

17   Q.   Was your goal in writing this report -- I should say was

18   your and the defendant's goal in writing this report, to

19   document accurately what happened?

20   A.   No.

21   Q.   Therefore would it have had any value to what you were

22   trying to do to go watch the cell phone?

23   A.   No.

24   Q.   What instead was your understanding of your shared

25   writing of the report?

1    A.    Just being done with it completely.

2    Q.    To be what?

3    A.    Just to get it over with.

4    Q.    Meaning what exactly?

5    A.    I didn't want anything to do with it.

6    Q.    You were asked a series of questions as to whether an

7    officer could arrest someone if they committed crimes in front

8    of them.  Do you recall that?

9    A.    Yes.

10   Q.    When you were there with Brent Thomas and the defendant,

11   did Brent Thomas commit any crimes in front of you while you

12   were there?

13   A.    No.

14   Q.    Did the defendant claim to you that Mr. Thomas had

15   committed any crimes in front of both of you in that moment

16   while you were there?

17   A.    No.

18   Q.    Even if Mr. Thomas had committed a crime in front of you

19   and Mr. Abbott, you would only agree that means you're allowed

20   to arrest him at that point?

21   A.    Right.  Yes.

22   Q.    From your experience and training, if someone commits a

23   crime in front of you, does that allow you to search their

24   entire hotel room?

25   A.    No.

1    Q.   Does that allow you to throw someone into a wall?

2    A.   No.

3              MR. DEMBO:  One moment, Your Honor.

4         Thank you, Your Honor.

5    BY MR. DEMBO:

6    Q.   You mentioned a second ago that your goal in writing the

7    report after the discussion with the defendant was to get it

8    over with or be done with it; is that right?

9    A.   Yes.

10   Q.   What exactly do you mean by that?

11   A.   Just not being a part of it, if that makes sense.

12   Q.   Be a part of what?

13   A.   I don't want to make it seem like I'm circling, as to

14   that situation.

15   Q.   What's that situation?

16   A.   That use of force.

17   Q.   And so when you say not to be a part of that situation,

18   that use of force, what was it that you were trying to do by

19   writing this false narrative in relation to that use of force?

20   A.   Well, not getting Tanner in trouble, not wanting to get

21   in trouble.

22   Q.   Okay.  Thank you, sir.

23             THE COURT:  If there is any additional questions on

24   recross on matters brought out on redirect.

25             MR. MORGAN:  Yes, sir.

|   |   |
|---|---|
| 1 | RECROSS-EXAMINATION |
| 2 | BY MR. MORGAN: |
| 3 | Q.   You were shown this 302, this is that FBI report, the |
| 4 | name of a file or form number 302.  And you were asked to look |
| 5 | at the bottom part.  What do you recall based on having seen |
| 6 | this then, what do you recall the hotel owner saying to you? |
| 7 | A.   What do I recall? |
| 8 | Q.   Yes, sir. |
| 9 | A.   I just remember us having a conversation. |
| 10 | Q.   Okay. |
| 11 | A.   And us both going down there, I recollect that as well. |
| 12 | Q.   Okay.  What do you recall the hotel owner saying to you |
| 13 | about bringing drugs into the hotel? |
| 14 | A.   He didn't want it in the hotel, he didn't want that going |
| 15 | on in his hotel. |
| 16 | Q.   Right.  And then what do you recall about the hotel owner |
| 17 | saying whether he gave you and Tanner permission to enter into |
| 18 | or search Thomas's room? |
| 19 | A.   I don't remember that. |
| 20 | MR. MORGAN:  May I approach the witness, Judge. |
| 21 | THE COURT:  Yes, sir. |
| 22 | BY MR. DEMBO: |
| 23 | Q.   Again, this is on the bottom of the first page, top of |
| 24 | the second. |
| 25 | A.   Okay. |

1   Q.   Have you read it, sir?

2   A.   Yes.

3   Q.   So what do you recall based on having reviewed that, what

4   do you recall the hotel owner telling you about whether you

5   had permission to enter or search that room?

6   A.   I just remember him stating that he didn't want him in

7   the hotel, he didn't want him there.  He wanted him out.

8   That's what I remember.

9   Q.   Okay.  Is that what that 302 says?

10           MR. DEMBO:  Your Honor, objection to hearsay.

11           THE COURT:  I'm sorry, when you show a document to a

12   witness to refresh their memory, they are able to refresh

13   their memory and then testify based on their memory, does not

14   make the document admissible and you can't then read from it

15   into the record.  So he's answered your question, you can

16   retrieve the document.

17           MR. MORGAN:  Read the document.

18           THE COURT:  No, you cannot.  You can retrieve the

19   document, you can get it back, he's answered your question.

20   BY MR. MORGAN:

21   Q.   Did the hotel owner give you permission to enter into

22   this hotel room?

23   A.   I don't remember that.

24   Q.   Giving a key would be giving someone permission?

25           MR. DEMBO:  Your Honor, asked and answered.

1            THE COURT:  Sustained.

2            MR. MORGAN:  Okay.  That's all I have.

3            THE COURT:  Thank you.

4        Anything else.

5            MR. DEMBO:  No, Your Honor.

6            THE COURT:  Thank you, officer.  You may step down,

7    you're excused.

8            MR. MORGAN:  Judge, we ask the witness not be

9    excused.

10            THE COURT:  Is he under subpoena by the defendant?

11            MR. MORGAN:  No, sir.

12            THE COURT:  Request is denied.  You may step down,

13    you're excused.