UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 23-109-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| TANNER M. ABBOTT, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendant Tanner Abbott's motion for a new trial. Abbott contends that the Court erred by failing to grant his pretrial motion to sever various charges for purposes of trial and by failing to exclude "other acts" evidence that the government was permitted to introduce pursuant to Rule 404(b) of the Federal Rules of Evidence. The defendant's motion will be denied for the reasons that follow.

## I.

A federal grand jury indicted Abbott on seven counts relating to his abuse of authority while acting as a deputy sheriff with the Boyle County, Kentucky Sheriff's Office.[1] Count 1 alleged that on or about April 28, 2021, Abbott used unreasonable force while arresting an individual identified as J.C. in Jessamine County, Kentucky, in violation of 18 U.S.C. § 242. Count 2 alleged that on or about February 2, 2021, Abbott used unreasonable force while arresting an individual identified as W.W. in Boyle County, Kentucky, in violation of 18

---

[1]     Abbott was indicted on October 5, 2023. A grand jury returned a superseding indictment on December 7, 2023, which did not add any charges, but corrected some details such the counties in which the events were alleged to have occurred.

- 1 -

U.S.C. § 242.  Count 3 alleged that Abbott conspired with another person to falsify records related to his arrest of W.W. in violation of 18 U.S.C. § 1519.

Counts 4, 5, and 6 were alleged to have occurred on or about March 31, 2021, in Mercer County, Kentucky and involve an individual identified as B.T.  Count 4 alleged that Abbott illegally searched B.T.'s hotel room in violation of 18 U.S.C. § 242.  Count 5 alleged that Abbott falsely documented that B.T. had given consent for Abbott to search his hotel room, in violation of 18 U.S.C. § 1519.  And Count 6 alleged that Abbott used unreasonable force while arresting B.T. in violation of 18 U.S.C. § 242.

Finally, Count 7 alleged that on or about January 20, 2021, in Boyle County, Abbott used unreasonable force while arresting two individuals identified as D.N. and C.B., in violation of 18 U.S.C. § 242.

On November 16, 2023, Abbott filed a motion to sever the charges into three separate jury trials.[2]  He argued that Count 1, Counts 2 through 6, and Count 7 should be tried separately because the evidentiary overlap between those counts would be minimal and he would suffer undue prejudice if all counts were tried together.  The Court, however, determined that joinder was proper pursuant to Rule 8(a) of the Federal Rules of Criminal Procedure.  And because Abbott failed to demonstrate substantial, compelling, or undue prejudice as required under Rule 14(a), the undersigned denied the motion to sever.  [Record No. 35]

Following a five-day trial, a jury convicted Abbott of all charges except Count 6.  Abbott filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure following the jury's verdict.

---

[2]     Abbott originally argued that four separate trials were necessary but altered his position in his reply to the government's response.  [Record No. 34]

## II.

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The Rule does not define "interest of justice," but it is widely agreed that this standard allows the grant of a new trial where a substantial legal error has occurred.  *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010).  *See also United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) (observing that "any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial") (quoting 3 Charles Alan Wright, Federal Practice & Procedure § 556 (3d ed. 2004)).  The decision regarding whether to grant a new trial rests within the sound discretion of the district court.  *United States v. Hoffa*, 382 F.2d 856, 862 (6th Cir. 1967).

## III.

Abbott's initial arguments are similar to those raised in his pretrial motion to sever.  He contends that the charges should not have been joined in a single indictment under Rule 8(a) of the Federal Rules of Criminal Procedure.  He goes on to argue that, even if the charges were properly joined under Rule 8(a), they should have been severed under Rule 14(a) due to the prejudicial nature of trying the charges together in single trial.  Having reviewed the parties' briefs and the applicable caselaw, the Court remains unpersuaded by these assertions.

### A.      The counts were properly joined under Rule 8(a).

Rule 8(a) of the Federal Rules of Criminal Procedure provides that an indictment may charge a defendant in separate counts with two or more offenses if the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  The United States Court of Appeals for the Sixth Circuit has held that Rule 8 should be construed in favor of joinder.  *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002).  *See also United States v. Bibby*, 752 F.2d 1116, 1121 (6th Cir. 1985) (observing that "[t]he joinder provisions of Rule 8(a) are more liberal than those of 8(b) because they allow inclusion of offenses of the 'same or similar character' as well as those arising from the same act or transaction or a common scheme").

Counts 1, 2, 4, 6, and 7 are all of a similar nature.  Each alleged that Abbott willfully deprived a person of a constitutional right while acting under color of law in violation of 18 U.S.C. § 242.  With the exception of Count 4, which charged an illegal search of an individual's hotel room, the remaining counts alleged the unreasonable use of force during arrests.  And Counts 3 and 5 arose from Abbott's efforts to cover up the crimes alleged in Counts 2 and 4, respectively.  Abbott argues that "simply having multiple counts charged under the same statutory provision is not itself sufficient to qualify the counts as being of the same or similar character for joinder purposes," but he does not cite any authority from the Sixth Circuit to support this proposition.

Instead, Abbott continues to rely on the decision in *United States v. Jawara*, 474 F.3d 565, 578 (9th Cir. 2007), which instructs that, in determining whether joinder of counts is proper, courts should consider "temporal proximity, physical location, modes of operation, identity of the victims, likelihood of evidentiary overlap, and the like, to the extent that they

- 4 -

can be gleaned from the indictment." But as noted previously, the Sixth Circuit has not adopted this position and the Ninth Circuit's decision in *Jawara* is not binding on this Court. *But see United States v. Weir*, 2012 WL 5361045 (E.D. Ky. Oct. 30, 2012) (applying the *Jawara* factors to help determine whether the defendant's charges for kidnapping and bank robbery were the "same or similar").

Regardless, the undersigned observed that several of the *Jawara* factors support joinder of Abbott's charges. [Record No. 35, p. 4] As explained previously, the incidents occurred over a relatively brief period (four months) and within a relatively small geographical area (three adjacent counties). Given the similarity and temporal proximity of the charges, an alleged mode of operation can reasonably be inferred from the charges, as well. Finally, a degree of evidentiary overlap would be expected based on testimony regarding Abbott's training and testimony from the government's case agent, at the very least.[3]

## B. Severance was not required under Rule 14(a).

Having concluded that joinder of the charges was proper under Rule 8(a), the Court turns to Abbott's claim regarding relief from prejudicial joinder under Rule 14. There is a strong presumption in favor of joint trials of offenses properly joined under Rule 8(a). *United States v. Wilson*, 2011 WL 5121098, at *4 (S.D.N.Y. July 11, 2011) (citing *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004), *cert. denied*, 544 U.S. 924 (2005)). However, Rule 14(a) of the Federal Rules of Evidence provides that, "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government, the court may order

---

[3]      Abbott contends that the government overstated the extent of overlapping evidence in response to his original motion to sever. But whether joinder is proper under Rule 8(a) is determined by the allegations on the face of the indictment. *Chavis*, 296 F.3d at 457.

separate trials of counts, sever the defendant's trials, or provide any other relief that justice requires."  The Sixth Circuit has observed that "[a] defendant is prejudiced if the jury would be unable to keep the evidence from each offense separate and unable to render a fair and impartial verdict on each offense."  *United States v. Smith*, 138 F. App'x 775, 781 (6th Cir. 2005) (citing *United States v. Rox*, 692 F.2d 454 (6th Cir. 1982)).

Abbott argues that, given the difficulty of sorting through the evidence and considering certain evidence only for its limited purpose, the jury did not reach a reliable judgment.  He further asserts that, by proceeding on all seven counts in one trial, the government was permitted to introduce the equivalent of character evidence indicating that Abbott had a propensity for violence and for being untruthful.  However, "one inevitable consequence of a joint trial is that the jury will be aware of evidence of one crime while considering the defendant's guilt or innocence of another."  *United States v. Foutz*, 540 F.2d 733, 736 (4th Cir. 1976).

The Sixth Circuit Pattern Jury Instructions contemplate this likelihood, as Instruction 2.01A, which was given in Abbott's trial, cautions the jury as follows:

> The defendant has been charged with several crimes. The number of charges is no evidence of guilt, and this should not influence your decision in any way. It is your duty to separately consider the evidence that relates to each charge, and to return a separate verdict for each one. For each charge, you must decide whether the government has presented proof beyond a reasonable doubt that the defendant is guilty of that particular charge.
>
> Your decision on one charge, whether it is guilty or not guilty, should not influence your decision on any of the other charges.

There is a presumption that juries will follow the Court's instructions and are capable of sifting through the evidence and considering each count separately.  *See United States v. Carver*, 470 F.3d 220, 238 (6th Cir. 2006).  Accordingly, a general assertion that the defendant

has been prejudiced by the number of charges presented is not sufficient to warrant severance for purposes of trial. Instead, to prevail on a motion to sever charges that are properly joined under Rule 8, "the defendant must show compelling, specific, and actual prejudice." *Thomas v. United States*, 849 F.3d 669, 675 (6th Cir. 2017).

Abbott contends that compelling, specific, and actual prejudice occurred at trial because Counts 3 and 5 involved evidence of Abbott's dishonesty, which was unrelated to Counts 1 and 7. He maintains that if the charges had been severed as he requested, this prejudicial (and, he contends, irrelevant) evidence would not have been admitted with respect to Counts 1 and 7. But as the United States points out, evidence of Abbott's role in drafting false or misleading paperwork was introduced for *each* of the charged incidents and, therefore, would have been at issue regardless of whether all counts were joined.

The government's argument on this point is well taken. With respect to Count 1, Abbott testified that he struck J.C. in the face after J.C. spat on him and conceded that he did not document this use of force. Likewise, with respect to Count 7, Abbott admitted that he did not document the uses of force he employed against D.N. and C.B. until the sheriff eventually asked him to write a report, which he backdated to January 21, 2021. Astonishingly, Abbott testified that he never documented a use of force unless a supervisor heard about it indirectly and came to him after the fact and asked him to do so. Accordingly, while Abbott may have been prejudiced to some degree by the joinder of all charges, he has not shown compelling, specific, and actual prejudice.

## C.     Abbott has not identified any other legal error that warrants a new trial.

Abbott contends that he was further prejudiced by the Court's exclusion of a recording of his call to dispatch during the encounter with D.N. and C.B. on April 20, 2021. The Court

previously excluded the statements on the recording as hearsay and noted, to the extent a portion of the recording might constitute a present sense impression, it was unreliable and cumulative.  Abbott has not identified any basis to disturb the Court's prior ruling.[4]

Abbott also contends that the Court erred by providing Jury Instruction No. 32, which stated:

> With respect to Counts 2, 4, 6, and 7, you have heard testimony that after the crimes were supposed to have been committed, the defendant made untrue statements.
>
> If you believe that the defendant made untrue statements, then you may consider this conduct, along with all the other evidence, in deciding whether the government has proved beyond a reasonable doubt that he committed the crimes charged.  Providing false statements to others may indicate that the defendant thought he was guilty and was trying to avoid punishment.  On the other hand, sometimes an innocent person may make untrue statements for some other reason.  The defendant has no obligation to prove that he had an innocent reason for his conduct.

[Record No. 75, p. 45]   Abbott maintains that this instruction unduly emphasized the government's version of the case.

This instruction is based on Sixth Circuit Pattern Instruction 7.14, which concerns false exculpatory statements.  It is well established that a jury may infer consciousness of guilt from a defendant's false exculpatory statements.  *See United States v. Tedesco*, 103 F.3d 131 (6th Cir. 1996) (table) (citing *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir, *cert. denied*, 516 U.S. 926 (1995)).  Here, the jury heard evidence of several statements by Abbott that could reasonably fall into this category.  These include his statements that W.W. "aggressively advanced" toward him prior to his Abbott's use of force, that B.T. consented to a search of his

---

[4]      Abbott's counsel advised the Court during a sidebar conference that Abbott could be heard stating "we've got a fighter here or someone fighting or whatever that is to that effect."  Having reviewed the recording *in camera*, the Court notes that the statements are unintelligible.

hotel room, and that D.N. and C.B. were "fighting" him, necessitating his use of force against them.  This instruction did not unduly emphasize the government's version of the case, as the jurors were reminded that it was up to decide whether Abbott actually made the statements, whether they were true, and what weight to give them.

Finally, Abbott asserts that the evidence admitted under Rule 404(b) of the Federal Rules of Evidence should have been excluded because its probative value was substantially outweighed by its prejudicial effect.  The jury heard about text messages from various dates in 2020 and 2021 in which Abbott made statements to other law enforcement officers concerning the use of force against suspects and/or "violating rights."   The jury also heard that Abbott used force against J.C. approximately 10 months prior to the incident charged in Count 1.  Additionally, the jury heard that Abbott stopped W.W.'s relative a few weeks before the incident charged in Count 2 and, that after the relative expressed fear of being shot by police, Abbott advised him that he would "just beat [his] ass."  B.T. testified that while Abbott was driving him to jail, Abbott twice accelerated his patrol car to high speeds and then braked suddenly, causing the handcuffed B.T. to lurch forward into the bars of the car's prisoner transport compartment.  Finally, the jury heard that B.T. had just made insulting remarks to Abbott each time this occurred.

The jury was instructed that, if it found that the defendant did these uncharged acts, it could consider the evidence only as it related to the government's claim on Abbott's willfulness, motive, intent, knowledge, absence of mistake, and absence of accident for the charged acts of deprivation of rights under of color of law, and for no other purpose.  In his motion for a new trial, Abbott simply contends that because the 404(b) evidence is so similar

to the charged acts, the likelihood of prejudice is so great that a curative instruction was insufficient to ameliorate the harm.[5]

The Sixth Circuit has observed that, "[w]hen jurors hear that a defendant has on earlier occasions committed essentially the same crime as that for which he is on trial, the information unquestionably has a powerful and prejudicial impact." *United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994). However, much of the 404(b) evidence was not substantially similar to the charged conduct and consisted of text messages in which Abbott appeared to be boasting or joking with fellow officers regarding uses of force or "violat[ing] rights." These messages were probative of Abbott's willfulness with respect to the charged offenses, which the government had the burden of proving under 18 U.S.C. § 242. Although the jury did hear that Abbott used force against J.C. and B.T. on uncharged occasions, nothing suggests that the limiting jury instruction was not sufficiently curative. The fact that Abbott was acquitted of depriving B.T. of his right to be free from excessive force during arrest suggests that the jury was able to follow the Court's instructions and was not unduly influenced by this evidence.

## IV.

Finally, the Court turns to arguments raised for the first time in Abbott's reply. While issues first raised in a reply brief are generally forfeited, the Court has considered these arguments and will explain why they are without merit. *See United States v. Frazier*, — F.Supp.3d—, 2023 WL 4930187, at *47 (M.D. Tenn. Aug. 2, 2023) (citing *Sanborn v. Parker*, 629 F.3d 554, 579 (6th .Cir. 2010)).

---

[5]     Abbott does not dispute that the Court followed the proper three-step procedure for admitting evidence under Rule 404(b). He merely contends that the Court erred with respect to the third step, which asks whether the evidence is substantially more prejudicial than probative. *See United States v. Carter*, 779 F.3d 623 (6th Cir. 2015).

**A.       The jury's verdict was not against the manifest weight of the evidence.**

Abbott contends that the jury's verdict was against the manifest weight of the evidence.[6]  A motion for a new trial on this basis calls on the Court to take on the role of a thirteenth juror, weighing evidence and making credibility determinations to make sure there is not a miscarriage of justice.  *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018).  Unlike a motion under Rule 29 of the Federal Rules of Criminal Procedure, Rule 33 does not require the Court to view the evidence in a light most favorable to the prosecution.  *Id.* (*citing United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007)).

In this case, the undersigned concludes that the jury's findings are supported by the weight of the evidence and reflect sound credibility assessments.  With respect to Count 1, Abbott testified that he struck a handcuffed J.C. in the face because J.C. spat at him.  Officer John Gibson testified that he was present during this incident and that he witnessed Abbott administer a "closed physical strike" to J.C.'s left cheek while J.C. was handcuffed and was not resisting arrest.  Gibson testified that he did not see J.C. spit at Abbott or make any sounds or movements consistent with spitting.  Gibson testified that he was shocked by Abbott's conduct and that it was inconsistent with his training to strike a suspect who is handcuffed and compliant.

J.C. testified that Abbott "sucker punched" him in the left side of his face while he was handcuffed and complying with Abbott's commands.  J.C. denied spitting on Abbott, resisting arrest, or making any other aggressive movements.  The jury saw J.C.'s mugshot that was

---

[6]       Abbott made a passing reference to this in his initial brief, but did not attempt to flesh out the argument in any way.   [Record No. 83-1, p. 6]

taken that day, which showed a bruise beneath J.C.'s left eye.  Abbott conceded that he did not document the alleged spitting or his use of force on J.C.

Even if the jury believed Abbott's version of events (which was not required), it reasonably could have concluded that Abbott acted willfully in using unreasonably excessive force in the course of arresting J.C., which resulted in bodily injury to J.C.

The jury's verdict regarding Count 2 concerning W.W.'s arrest also is supported by the evidence.  Abbott and his partner, Officer Braydon Hopper, were present during this traffic stop.  Abbott, Hopper, and W.W. largely agree concerning the facts leading up to Abbott's use of force.  Abbott recorded the events on his cell phone, which also corroborated the events and was introduced at trial.

Abbott and Hopper worked together to initiate a traffic stop based on a narcotics investigation involving W.W.  After Abbott's narcotics detection dog positively alerted on the vehicle, Abbott patted down W.W. and discovered what he believed to be a methamphetamine pipe in W.W.'s pocket.  Abbott quickly handcuffed W.W.'s left wrist, but W.W. failed to comply with Abbott's command to place his right hand behind his back.  W.W., who was standing up facing his vehicle, turned slightly to the right to "talk" to Abbott.  The cell phone video did not capture what happened next, but it is undisputed that Abbott punched W.W. in the face.

Abbott testified that the use of force was necessary because W.W. refused to comply with his command to place his right hand behind his back.  Hopper testified that although W.W. was being "mouthy," he did not make any aggressive movements toward Abbott. Hopper believed that less forceful means of gaining compliance, such as placing the defendant against a hard surface and using pressure points, would have been appropriate.

Whether the particular use of force was reasonable was a question for the jury. Hopper testified that it was inconsistent with his training to punch a defendant who simply was not giving one of his hands to be placed in handcuffs. Here, based on the cell phone video and testimony, the jury reasonably determined that the force was excessive given the apparent lack of aggressive action on the part of W.W. The jury also reasonably concluded that the use of force resulted in bodily harm to W.W., based on the excessive nature of the force and W.W.'s testimony that he suffered a busted lip.

The jury's verdict with respect to Count 3 also is supported by substantial evidence. This count charged Abbott with conspiring with another person to falsify a document in a federal investigation. Hopper testified that he completed an arrest citation for W.W. based on the traffic stop described in Count 2. Hopper charged W.W. with various offenses, including resisting arrest and disorderly conduct. Hopper testified that these charges were not supported by what he actually observed during the traffic stop, but he had charged them because he "wanted to make [Abbott] look good and [he] didn't want him to get in trouble." Most importantly, Hopper documented that W.W. "made an aggressive advancement towards Deputy Abbott in which Deputy Abbott used a hard empty hand technique and taken to the ground to gain compliance." Hopper testified that W.W. did not actually make an aggressive advancement and that he included the statement in his citation *because Tanner told him to do so*. Hopper admitted that he initially did not tell the FBI that the report was false and stated that he could not remember why he failed to disclose that fact. Regardless, the jury reasonably believed Hopper's testimony, particularly in light of the cell phone video which did not show any aggressive advancement by W.W.

- 13 -

There was ample evidence to support the jury's verdict with respect to Count 4, which charged that Abbott illegally searched the hotel room lawfully occupied by B.T.  Significant evidence presented at trial contradicted Abbott's testimony that B.T. gave consent to search his hotel room.

Hopper testified that when he and Abbott arrived at the hotel where B.T. was staying on March 31, 2021, they knocked on the door of B.T.'s room and no one answered.  Abbott then retrieved a key from the front desk.  This testimony was supported by that of Dave Patel, the owner of the hotel, who testified that Abbott came to the front desk on that date and advised that he had a warrant to search B.T.'s hotel room.  Patel testified that, consistent with his practice of cooperating with law enforcement, he gave Abbott a key to B.T.'s room.

Hopper testified that Abbott attempted to open the door by unlocking it, but the door was latched from the inside.  At that point, B.T. came out into the hallway and Abbott and B.T. began "exchanging words."  According to the testimony of B.T. and Hopper, Abbott then barged into the room and began rifling through B.T.'s belongings.

This testimony is contradicted by that of Abbott, who maintains that B.T. gave him permission to search his room in exchange for "another chance" to avoid going to jail on the condition that nothing illegal was found in the room.  The jury easily could have disbelieved Abbott's testimony in light of B.T., Hopper, and Patel's conflicting testimony and the fact that marijuana and methamphetamine were found in the room.

Based on Abbott's conviction with respect to Count 4, the jury reasonably found him guilty of Count 5, which charged him falsely documenting that B.T. consented to the search of his hotel room.

- 14 -

Finally, the jury's verdict regarding Count 7 is supported by substantial evidence. Abbott initiated a traffic stop of C.B. and D.N. on January 20, 2021, after he observed D.N. driving erratically.  Abbott testified that, when he approached the vehicle, C.B. and D.N. appeared to be under the influence.  Abbott maintains that he asked D.N. to step out of the vehicle to take a field sobriety test.  However, according to Abbott, D.N. refused to take the test and stated that he was not going to jail.  D.N. then turned away from Abbott and resisted Abbott's attempts to place him under arrest.  Abbott testified that he took D.N. to the ground and was able to place him in handcuffs.

Abbott stated that C.B. got out of the vehicle and charged toward him, despite Abbott's commands to stop.  Abbott began to place C.B. under arrest for public intoxication, but C.B. would not comply.  Accordingly, Abbott contends that he used a soft empty hand technique to take him to the ground and place him in handcuffs.  After the fact, Abbott noticed that C.B. had a scratch on his eye and that his glasses were broken.

After securing C.B., Abbott returned to check on D.N.  According to Abbott, D.N. was acting "manifestly under the influence" and was getting near the roadway.  Abbott walked D.N. away from traffic and attempted to sit D.N. down on his bottom.  However, D.N. leaned back and began "kicking as hard as he could."  Abbott notified dispatch that he had a suspect who was fighting and needed backup.  Abbott testified that D.N. continued to fight, so Abbott struck him one time in the head with a closed empty hand to gain compliance.  Abbott then called EMS because he believed he might have knocked D.N. unconscious.

C.B. and D.N. both testified at trial—their version of events differs significantly from Abbott's testimony.  C.B., who was 18-years-old at the time of the incident, testified that he had vaped THC about 30 minutes prior to the traffic stop; 20-year-old D.N. had not consumed

any intoxicants.  Both witnesses testified that Abbott approached their vehicle and immediately accused D.N. of being drunk.  D.N. denied this accusation and he and Abbott began "arguing back and forth."  D.N. asked Abbott to call a supervisor, which C.B. and D.N. believed made Abbott angry.  According to C.B. and D.N., Abbott hit D.N. in the face, pulled him out of the car, and threw him to the ground, where Abbott continued hitting him.

C.B. testified that he got out of the car and walked around to the front driver's side area and yelled for Abbott to stop.  Abbott directed C.B. to step back.  C.B. stated that he stepped back "a little," after which Abbott elbowed C.B. in the eye, breaking his glasses.

While the Court acts as a thirteenth juror in considering motions under Rule 33, it does so to ensure that no miscarriage of justice occurs.  *Hughes*, 505 F.3d at 592.  No miscarriage of justice has occurred here because the evidence supports Abbott's conviction with respect to Count 7.   C.B. and D.N. were credible witnesses.   If the jury accepted C.B. and D.N.'s testimony as true, it was not unreasonable in doing so.  But even if the jury believed Abbott's testimony that D.N. was kicking him, it reasonably could have concluded that Abbott's use of force was improper and excessive.

D.N.'s injuries were severe.  Emergency room records from the night of the incident reveal that he sustained left-sided nasal bone fractures and a fracture of the frontal process of the left maxilla.  The jury heard the testimony of Detective David Lewis, of the Nicholasville, Kentucky Police Department who was one of the backup officers that responded to the scene after the use of force occurred.  Lewis's initial impression based on D.N.'s behavior that night was that D.N. was "on something."  However, Lewis subsequently came to believe that D.N.'s appearance and behavior was more consistent with a head injury than with alcohol or drug intoxication.

Detective Lewis was wearing a body camera that captured some of Abbott's conduct following the use of force, which further supports the jury's verdict.  Abbott is seen repeatedly laughing and showing his hand to other officers.  Additionally, he sent multiple text messages just hours after the incident stating, for example, "[j]ust broke my hand and someone's face lol" and "3 facial fractures with one punch lol."  While Abbott explained that these comments and messages were his way of dealing a difficult situation, the jury reasonably could have concluded that they were evidence of his willful use of unreasonably excessive force in making an arrest.

### B.    The government did not engage in misconduct.

Abbott also contends for the first time in his reply that the government improperly opined on his character and misrepresented facts in "several instances."  He further asserts that the prosecution "was able to get away with making statements that cross the line of what is appropriate for a prosecutor."  Abbott contends the Assistant United States Attorney made the following "false statements" during closing arguments:

> He took his own video of that arrest [W.W.] but he never submitted it in evidence, he never told anyone it existed because it didn't support that false story that he fed to Deputy Hopper.

> You know he knew it because he told Deputy Hopper to cover it up.

> That video [W.W. arrest video] was unquestionably evidence but the defendant never made anyone aware it existed.

Abbott contends that these statements are false because the W.W. arrest video "clearly and unequivocally showed the Defendant telling the officers on scene that he was recording the arrest, thus he made several people aware that the video existed."  Abbott further contends

- 17 -

that "there was no testimony to support that the Defendant told Deputy Hopper 'to cover it up.'" [Record No. 83, p. 3]

The defendant takes the prosecutor's statements regarding the cell phone video too literally. It was clear from the context of the statement that the "anyone" the prosecutor was referring to was a supervisor who would be responsible for reviewing Abbott's use of force. As Abbott points out, *clearly* other officers on the scene knew that Abbott was recording the video. Accordingly, Abbott was not prejudiced by these statements made during closing arguments.

Likewise, the prosecutor did not misrepresent the evidence by stating that Abbott told Hopper "to cover it up." Hopper testified that he was on the phone with Abbott when he authored the report concerning W.W.'s arrest and that he wrote that W.W. aggressively advanced toward Abbott *because Abbott told him to*. This constitutes "covering up" the fact that there was not a sufficient basis for the force Abbott used. The prosecutor is allowed to interpret and summarize the evidence during closing arguments.

Abbott also contends that the government misrepresented to the jury the testimony of its own witness, Cameron Gastineau, who the government asserted witnessed Abbott's arrest of D.N. and C.B. from a Wendy's parking lot near the scene of the incident. Gastineau testified that he witnessed a traffic stop in which an officer pulled an individual out of a vehicle and slammed him up against it, before taking the individual to the ground. However, when pressed on the details, Gastineau recalled the traffic stop being in a different location than where the incident with D.N. and C.B. actually occurred. Further, when defense counsel showed him a photograph of D.N.'s vehicle, Gastineau testified that was not the vehicle he saw that night.

These inconsistencies in Gastineau's testimony are not conclusive evidence that he did not actually witness the event, which had occurred years prior to the trial. The government's statements in its closing argument were not misleading. The jury reasonably could have concluded that Gastineau simply was confused in his recollection of events and was not asked to make a decision based on Gastineau's testimony alone.

Finally, Abbott contends that the following statements made by the Assistant United States Attorney during closing arguments "improperly reflect the United States' opinion" on Abbott's credibility:

> He placed his bets that his own false stories would be enough to protect him. Same bet he placed when he took the stand and lied to all of you and told you to believe things that aren't supported by the evidence and just don't make sense.
>
> And ladies and gentlemen—and I'll include the convicted felons in this, he was the least credible witness in this trial. He got caught lying, and lying, and lying.
>
> His self-serving testimony wasn't credible. When you go back to deliberate, you should disregard it entirely.

Notably, the defendant did not provide any authority in support of the proposition that these statements by the prosecutor were improper. Improper vouching occurs when the prosecutor implies, either intentionally or inadvertently, that he is in a special position to ascertain whether the witness was or was not testifying truthfully. *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). And a prosecutor may not call the defendant "a liar" without reference to the evidence introduced at trial. *United States v.* Joiner, 727 F. App'x 821, 826 (6th Cir. 2018) (citing Francis, 170 F.3d at 551-52). But when a defendant testifies, a prosecutor may attack his credibility just like that of any other witness. *See United States v. Acosta*, 924 F.3d 288, 299 (6th Cir. 2019).

- 19 -

The Sixth Circuit has repeatedly recognized that a prosecutor may argue during his closing argument that a defendant is lying by pointing out inconsistencies in the defendant's testimony and other evidence.  *West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008); *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999).  The government did not attack Abbott's credibility based on the prosecutor's personal belief nor did the prosecutor suggest that Abbott's credibility was poor based on any information other than that presented at trial.  Instead, the prosecutor's references to Abbott's credibility were tied to the evidence presented at trial, including proof indicating that Abbott falsified paperwork on multiple occasions, lied to Dave Patel about having a warrant to search B.T.'s hotel room, and strategically kept certain conduct from being recorded.  Accordingly, the government's statements regarding Abbott's credibility during its closing argument were not improper.

### V.

As explained above, the defendant has not established that a substantial legal error has occurred, and the interests of justice do not warrant granting a new trial.  Accordingly, it is hereby

**ORDERED** that the defendant's motion for a new trial [Record No. 83] is **DENIED**.

Dated: April 17, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky